WALTER J. BERRY & others *vs.* OLD SOUTH ENGRAVING COMPANY & another.

Suffolk.    May 9, 1933. — June 28, 1933.

Present: RUGG, C.J., PIERCE, WAIT, FIELD, & LUMMUS, JJ.

*Corporation,* Corporate entity, Identity with previous corporation. *Agency,* What constitutes. *Contract,* What constitutes, With labor union. *Labor Union. Fraud.*

A contract between a corporation and a labor union provided that the corporation should employ none but members of the union. After the contract had been in effect for a time, persons who were the stockholders, officers and directors of the corporation came to believe that the union had violated the contract by permitting other employers, who had entered into similar contracts with the union, to pay less wages in certain respects than the corporation. Thereafter those persons, in good faith and for the purpose of carrying on the business in which they were interested as an open shop and free of the obliga-

tions under the contract with the union, organized another corporation. Thereupon the first corporation sold its property to the second corporation for stock therein; said persons purchased shares in the second corporation in the same proportion as that in which they had held shares in the first corporation and became officers and directors of the second corporation; the first corporation paid its debts and distributed its surplus cash to said persons, retaining bonds of a certain value as a reserve; the first corporation surrendered its lease and the second corporation took a new lease of the same premises; the first corporation discharged all its employees after giving the notice required by the contract with the union; and the second corporation hired a force of nonunion men and commenced business. In a suit in equity by the union against the two corporations to enjoin violation of the contract, there was no finding that the first corporation had done any corporate acts other than those described, or that the stockholders thereof, as such, authorized the organization of the second corporation or thereafter authorized it to act for the first corporation, or that the second corporation had purported to act for the first corporation in any way. The bill was dismissed. *Held,* that

(1) The identity of the persons who were stockholders, officers and directors of the two corporations did not operate to merge them or to make either the agent of the other; each preserved its separate identity;

(2) The motive of the persons interested in the first corporation in forming the second corporation could not be said to be fraudulent as a matter of fact or as a matter of law;

(3) It could not properly be said that the second corporation was merely a continuation of the first corporation;

(4) The first corporation did not break the contract by ceasing to employ members of the union so long as it employed no others;

(5) The second corporation was not bound by the contract, which it had not made nor assumed;

(6) The bill rightly was dismissed.

BILL IN EQUITY, filed in the Superior Court on June 29, 1932, described in the opinion.

The suit was referred to a master. Material findings by him are stated in the opinion. A motion by the plaintiffs to recommit to the master was denied by *Goldberg,* J., by whose order there were entered an interlocutory decree confirming the master's report and a final decree dismissing the bill. The plaintiffs appealed from the denial of their motion and from both decrees.

*M. J. Robinson,* (*F. W. Mansfield* with him,) for the plaintiffs.

*E. H. Abbot, Jr.,* (*H. W. Packer* with him,) for the defendants.

PIERCE, J.   This is a suit in equity brought by the plaintiffs (hereinafter called the union) against the Old South Engraving Company (hereinafter called the old company) and the Old South Photoengraving Corp. (hereinafter called the new company) to enjoin the violation of an agreement entered into between the union and the old company and for damages.   The old company and, by stipulation of the parties, the new company filed an answer admitting the allegation of the bill contained in paragraph 5, in substance, that the union and the old company in January, 1930, entered into an agreement called a commercial agreement "which regulated generally the conditions of employment and prices to be paid employees"; and "Further answering the defendant says that it has complied in all respects with the agreement referred to in the plaintiff's bill of complaint, but that the members of said Union have violated the terms thereof by discriminating against the defendant and in favor of certain other employing photo engravers signing the agreement who were permitted to pay employee members of the said Union less than the rates established by said agreement . . . [and] that as a result of the violation by the members of said Union of the terms of said agreement the defendant has ceased to carry on any business whatsoever and has had no men in its employ."   Upon the filing of the answer the case was referred to a master.   The facts hereinafter stated are taken from the master's report which was duly filed.

The commercial agreement, which is annexed to the bill of complaint, contains the following article: "Section 1. That the Employing Photo Engravers signing this agreement shall employ none but members of the International Photo Engravers' Union of N. A., or applicants for positions holding permit from the Boston Photo Engravers' Union No. 3, I. P. E. U.   Section 2.   All employees must give one week's notice to employers before leaving their position and employers must give one week's notice before discharging or laying off employees."   This agreement took effect on January 1, 1930, to remain in full force and effect until December 31, 1934, with a provision under

which if no notice was given to the contrary before thirty days from the expiration of the agreement, it should be extended indefinitely from year to year until such time as such notice was given. The bill of complaint alleges in substance, and the answer admits, that in pursuance of said agreement the old company hired from twelve to fifteen members of the union who continued in the employ of the old company until June 4, 1932, and that they were then discharged. The master finds, in substance, that prior to the making of the contract with the old company there were conferences between the union and representatives of the employers, commercial photo-engravers in Boston, at which the terms of said contract were agreed to, and thereafter eight employers entered into contracts like that entered into by the defendant old company. In the early part of 1932 three of the eight signers of the commercial agreement failed to pay time and one half for overtime, as provided in the agreement. During this period the old company did pay time and a half for overtime in accordance with its agreement. At a meeting of the employers held prior to March 24, 1932, the matter of payment of employees for overtime was discussed, and the old company contended "that the fact that other employers, signers of the commercial agreement, paid only the 'straight time' rate for overtime, while it paid 'price and one-half,' was a disadvantage to it and worked a discrimination against it in respect both in the amount of money paid by it to its employees and in figuring contracts in competition with other photo-engravers."

On April 29, 1932, the old company sent a letter to the union, which, omitting caption and signature, reads: "This is to notify you that one month from today the agreement between the Union and the Old South Engraving Company will be terminated. Since this company was organized it has tried in every way to live up to the spirit and letter of its agreement with you, but the time has come when it realizes that the Union has not lived up to its part of the agreement. We find that we have been discriminated against with the knowledge and connivance of some

of the officers and members of the Union. The spirit of fair play has been lacking, which has resulted in the shops which have played the game being penalized. The Old South Engraving Company does not wish to have this condition continue, and consequently takes this action. Regretting very much to sever the relations that have always been harmonious, we remain." Respecting this letter the master finds that "when the defendant sent the letter of April 29 the defendant's officers and directors had decided to run a nonunion shop and to terminate the commercial agreement so far as it concerned the defendant. One of the reasons for this decision was the fact that other signers of the commercial agreement were not paying 'price and one-half' for overtime work as herein found. Huntsman, president of the defendant, testified, and I find, that he supposed that his company had the right to terminate the contract between it and Local No. 3 at any time by a thirty-day written notice; and I find that it was the intention of the defendant on April 29 to terminate said contract in thirty days from said date, and that the letter of April 29 was sent as a written notice to terminate in accordance with Huntsman's understanding of the contract."

In May, 1932, Walter H. Kelley, vice-president of the union and one of the plaintiffs, admitted to the president of the old company that certain employers, signers of the commercial agreement, were not paying "time and one-half" for overtime, and on May 19, 1932, at a conference between representatives of the union and all the directors, officers and stockholders of the old company, again admitted that certain employers were not paying "price and one-half" for overtime work. At this conference of May 19, 1932, the officers of the old company complained about this practice in some of the shops of the signers of the commercial agreement in respect to payment for overtime and asked the representatives of the union what guaranty the union would give that the practice would not arise in the future. The representatives of the union told the officers of the old company that they were not responsible for said prac-

tice and did not approve it, but that they could not guarantee that any employer would not violate his agreement. On May 26, 1932, there was a further conference between the representatives of the union and the president of the old company, Huntsman, who again asked the union representatives for guaranties that there would be no future violations of the commercial agreement with respect to paying overtime by other union shops without steps being taken by the union to stop said practice. This conference ended without result other than that the representatives of the old company stated that they would see their attorney. The master finds "that at the time this conference was had the officers of the defendant [old company] intended not to proceed under the commercial agreement but to conduct the business of the defendant as an open or nonunion shop."

On May 27, 1932, the directors of the old company consulted their attorney and were advised that whether the corporation could terminate the agreement and "run as an open shop would depend on the question whether the agreements between the Union employers and the Union would be regarded as a joint agreement and whether the courts would hold that the Union 'by permitting discrimination to continue had violated the agreement'"; that the agreement between the old company and the union was not binding on the individuals who composed the stockholders and directors of the old company; and that he (the attorney) saw no reason why the directors and stockholders, as individuals, could not start in business as a corporation. Thereupon the attorney was authorized to take the necessary steps to form a new corporation. The papers were prepared by him and on June 4, 1932, a new corporation was formed under the name of Old South Photoengraving Corp. The incorporators of the new corporation are the same persons who are or were directors, president, treasurer and clerk of the old corporation.

On May 27, 1932, the old company gave to its employees, all of whom were members of the union, the following notice: "As the Old South Engraving Company will shut

down for an indefinite period on Saturday June 4, 1932, your services will not be required after that date." In accordance with this notice said employees were discharged on Saturday, June 4, 1932.

The new company was organized with a capital of twelve thousand shares of no par value. The old company had a capital of one hundred twenty shares of the par value of $100 issued and outstanding, and all held by Huntsman, Balcom (the treasurer) and Paine (who was the clerk). Huntsman held one half, Balcom one third and Paine one sixth. The old company transferred its machinery, equipment and accounts receivable to the new company for nine thousand shares of its capital stock. The stockholders of the old company agreed to purchase stock of the new company as follows: Huntsman six hundred shares, Balcom four hundred shares and Paine two hundred shares. The cash held by the old company on June 4, 1932, was used to pay its liabilities and the balance left, $529, was distributed one half to Huntsman, one third to Balcom and one sixth to Paine. The old corporation also had a reserve in the form of certain bonds in the sum of approximately $3,300. These bonds were not transferred to the new corporation and had not been distributed up to the time of hearings before the master. Respecting the division of cash and the ultimate disposition of the bonds the · master found "that it was the purpose and intention of Huntsman, Balcom and Paine to use the money thus received, as well as the proceeds of the sale of the bonds . . . as the reserve of the Old South Engraving Company, in whole or in part, for the purpose of purchasing stock in the Old South Photoengraving Corporation and thus to furnish any necessary working capital of said corporation." The old company surrendered its lease at 173 Summer Street, Boston, and the new company took a lease of the same premises for the unexpired term on the same terms and conditions. A bank account was opened in the name of Old South Photoengraving Corporation, and new stationery was procured bearing that name. A new crew composed of nonunion men went to work for the new com-

pany on June 6, 1932. The master found that the new company employs twelve nonunion men, whereas the old company employed eleven members of the union.

"So far as it is a question of fact" the master found "that the organization of the corporation Old South Photo-engraving Company was for the purpose of carrying into effect the plan of the officers and directors of the Old South Engraving Company to conduct its business as a non-union or open shop; that while the officers and directors of the said Old South Engraving Company believed that Local No. 3 had violated its agreement, they did not purpose to contest the question of the violation of the agreement but that acting under the advice of their counsel they adopted the procedure of forming a new corporation believing that by so doing they could conduct their business as they planned to conduct it free from the obligations of the commercial agreement whether that agreement had been broken by the union or not. I further find that while the purpose of the officers of the defendant was conceived in good faith and was what they considered to be their legal right, in substance they adopted the new corporate form as a method of accomplishing the desired result of conducting the business in which they were severally interested in the same manner and upon the same conditions as it had theretofore been conducted with the single exception that it was conducted after June 4 as an open or nonunion shop rather than as a union shop as required by the commercial agreement." He further found "that the primary purpose of the officers and directors of the defendant corporation in organizing the new corporation was to escape from the obligations of the aforesaid commercial agreement"; that the union "is able, willing and ready to supply to the defendant members of the International Photo Engravers Union of North America holding permits from Boston Photo Engravers Union No. 3 in any numbers that the defendant [the old company] may require for work in its establishment and that members of the said union have tendered their services to the defendant [old company] and

that said tender of services and employment have been rejected by the defendant."

At the hearing before the master the plaintiffs filed written offers of proof of damages sustained by the union. The evidence was excluded. The plaintiffs filed objections to the master's report (1) to the admission of certain testimony of the attorney for the defendant (old company) and (2) to the exclusion of the plaintiffs' evidence of damages. They also filed a motion to recommit the master's report for the purpose of introducing evidence relative to damages. This motion was denied and from the order of the court denying this motion the plaintiffs duly appealed. They also appealed from an interlocutory decree confirming the master's report and from a final decree dismissing the bill. In their brief the plaintiffs do not argue that the testimony of the attorney for the old company was inadmissible, nor do they contend therein that without a right to injunctive relief there should have been a recommittal to the master for the purpose of introducing evidence relative merely to damages. These objections are therefore deemed to be waived.

If consideration be given to the finding of the master that the union was willing and ready at all times covered by the agreement to supply to the old company any members of the union that the old company might require for the work in its establishment, and if it be further found that the old company, as matter of law, was merely continued and consolidated in the new company, and that under the cloak of the new company the old company employed non-union men in violation of the commercial agreement, we assume, without decision, that a court of equity, without proof of actual damage, can specifically enforce, through the medium of an injunction, an agreement to "employ none but members of the International Photo Engravers' Union of N. A., or applicants for positions holding permit from the Boston Photo Engravers' Union No. 3, I. P. E. U." In the case here presented it is plain the officers and stockholders of the old company were the same officers,

directors and stockholders as the officers, directors and stockholders in the new company, and that they held shares of stock in the new company in the same proportion that they held stock in the old corporation; and it is found by the master "that while the purpose of the officers of the defendant [old company] was conceived in good faith and was what they considered to be their legal right, in substance they adopted the new corporate form as a method of accomplishing the desired result of conducting the business in which they were severally interested in the same manner and upon the same conditions as it had theretofore been conducted with the single exception that it was conducted after June 4 as an open or nonunion shop rather than as a union shop as required by the commercial agreement." On this finding the plaintiffs contend that the new company was organized and stock issued to the old company, not for the purpose of participating in affairs of the new company in the normal and usual manner but for the purpose of controlling a subsidiary so that it might be used as a mere agency or instrumentality of the old company and its stockholders. On the facts found by the master it is plain that the old company complied with the provisions of section 2 of the agreement which required that "employers must give one week's notice before discharging or laying off employees," and it affirmatively appears that the old company has not employed any men whatsoever after the discharge of the union men on June 4, 1932, down to and including the date of the bill of complaint. As contended by the old company, it is plain it cannot be held responsible for any acts of its officers or stockholders as individuals or for any acts of the new corporation. There is no finding that it has done any corporate acts except to sell its machinery, equipment and accounts receivable, pay its debts and distribute a part of its surplus in its treasury. There is no finding that the stockholders of the old corporation, as such, authorized the organization of the new company, or, on its being formed, authorized it to act for the old corporation in any shape or way, or that

the new company has in any manner purported to act for or to represent the old company. There is an express finding that the old company employed eleven union members as its crew of employees and the new company employs twelve nonunion men as its crew of employees. The identity of stockholders and the control of the new corporation do not operate to merge the old and the new corporations or to make either the agent of the other. *Marsch v. Southern New England Railroad*, 230 Mass. 483, 497. *Salomon v. A. Salomon & Co. Ltd.* [1897] A. C. 22.

The motive of the officers, directors and stockholders of the old corporation, as individuals, that is, the desire of these incorporators of the new corporation to secure through the instrumentality of a corporation authority to do business exactly like the business done by the old corporation without the burden of the commercial agreement as to the employment of union labor, cannot be regarded as fraudulent in fact or in law. Corporations, like individual stockholders, are distinct entities; neither can be treated as agents of the other when openly contracting for themselves and in their own names. *Marsch v. Southern New England Railroad*, 230 Mass. 483, and cases cited. "In the absence of a fraudulent purpose in the organization of a corporation, it is settled law in this Commonwealth that the ownership of all the stock and the absolute control of the affairs of a corporation do not make that corporation and that individual owner identical. Nor do such ownership and control make the property of the corporation subject to the payment of the stockholders' debts," nor subject the corporation to liability upon contracts which it has neither executed nor assumed. *Star Brewing Co. v. Flynn*, 237 Mass. 213, 217. The contention that the new corporation is but a continuance of the old company is without merit in fact or in law. *Brighton Packing Co. v. Butchers' Slaughtering & Melting Association*, 211 Mass. 398.

The bill was rightly dismissed as against the old company. It did not break the contract by ceasing to employ either members of the union or anybody else. The bill was

rightly dismissed as against the new company. It never contracted with the union nor assumed the contract of the old company.

*Decrees affirmed with costs.*