### ALBERT RICHARDS CO. INC. *vs.* THE MAYFAIR, INC., & others.

Suffolk.    May 25, 1934. — June 28, 1934.

Present: RUGG, C.J., PIERCE, FIELD, DONAHUE, & LUMMUS, JJ.

*Equity Pleading and Practice*, Appeal, Requests and rulings. *Corporation*, Officers and agents, Stockholder, Creditor. *Mortgage,* Of personal property: validity. *Equity Jurisdiction*, Conveyance in fraud of creditors. *Fraud*.

At the hearing of a suit in equity by a creditor of a corporation against the corporation and one, who was its treasurer and one of its directors and to whom it had given a mortgage which he had foreclosed, purchasing at the sale, to establish the debt due the plaintiff and to have the mortgage and its foreclosure declared void, the evidence was reported and it appeared that the debt of the plaintiff was contracted between March and October, 1932, and that the mortgage was given in May, 1932. There was evidence that, at the time the mortgage was given, the individual defendant had advanced large sums to the corporation; that only three shares of stock of the par value of $300 had been issued out of an authorized capitalization of $50,000; that there was no consideration for the mortgage other than the sums so advanced; that his purpose in procuring it was to protect the corporate assets from the corporation's other creditors; that at that time the corporation did not have sufficient assets or prospects of credit to meet the claims of those to whom it was indebted; that the amounts advanced by the mortgagee were carried on the corporation's books as a debt; and that he had purchased the interests of the only two persons who were owners of interests in the corporation. The trial judge found and ruled that the execution and delivery of the mortgage and the subsequent foreclosure sale constituted a positive and actual fraud upon the creditors of the defendant corporation, and a final decree as prayed for by the plaintiff was entered. On appeal by the defendants, it was *held*, that

(1) If the evidence were considered as showing that there had been a loan to the corporation by the individual defendant, he, as against other creditors of the corporation, could not enforce the mortgage, because it was found to have been given with actual intent to hinder, delay and defraud other creditors of the corporation;

(2) Even if the evidence were considered as showing that such mortgage had been given without actual intent to defraud other creditors of the corporation, the corporation could not thereby secure the individual defendant, who was its treasurer and one of its board of directors, in preference to other creditors;

(3) If the evidence were considered as showing that there had not been a loan to the corporation but a capital contribution by the individual defendant, he was not a creditor of the corporation and the mortgage given to secure his interest was void;

(4) In any view of the evidence, the final decree was warranted and must be affirmed.

Directors of a corporation which is insolvent or about to become so cannot obtain for themselves a preference over other creditors in respect to the assets by taking a mortgage or other security for preëxisting debts owed to them.

BILL IN EQUITY, filed in the Superior Court on April 27, 1933, against The Mayfair, Inc., Mark Sherman, and Club Mayfair, Inc., and described in the opinion.

The suit was heard by *Greenhalge*, J., the evidence being reported. Material evidence and findings and rulings by the judge are described in the opinion. From a final decree establishing the debt due the plaintiff in the sum of $1,089.16 and granting the relief sought, the defendants Sherman and The Mayfair, Inc., appealed.

The case was submitted on briefs.

*S. Sigilman*, for the defendants Sherman and another.

*L. G. Dennett & J. W. Gorman*, for the plaintiff.

PIERCE, J. By this suit in equity the plaintiff seeks to establish a claim against the defendant, The Mayfair, Inc., and to have declared void a personal property mortgage, given by The Mayfair, Inc., to the defendant Mark Sherman, and to have set aside a foreclosure sale thereof, on the ground that these were a fraud upon the plaintiff as a creditor. A final decree was entered granting the relief prayed for, and the case is before this court upon the appeals of two of the defendants from the final decree and exceptions to the judge's refusal to rule as requested. The evidence is reported. The record also contains findings and rulings by the trial judge.

The findings of fact by the trial judge are these: The plaintiff was a corporation duly organized and having a place of business in Boston. Prior to the filing of the bill the defendant The Mayfair, Inc., was indebted to the plaintiff for goods sold and delivered to it in the sum of $1,027.51. The goods were furnished between March 1,

1932, and October 22, 1932. The Mayfair, Inc., was a corporation duly organized and having a place of business at 54 Broadway, Boston. The incorporators were Benjamin Kabatznick, Jacob Staviski, and the defendant Mark Sherman who was the treasurer, a director, and a stockholder therein. The corporation was engaged in the business of conducting a restaurant and a place for dining and dancing, where the orchestra was under the direction of Staviski, known professionally as "Jack Renard." The authorized capital stock was fixed at $50,000, at a par value of $100 a share, and the amount then to be issued was three shares to be paid for in cash in full. The date of incorporation was September 26, 1930, and the company began to do business in October, 1930. The premises at 54 Broadway were fitted up for occupancy by one Kaufman, to whom the corporation became indebted for considerable sums, and on or about November 6, 1930, an agreement was entered into by which Kaufman by assignment conveyed to Sherman all his claims against The Mayfair, Inc., and gave him a bill of sale of all his rights, title and interest in and to all the personal property on the premises in consideration of a cash payment by Sherman of $14,000, a note payable to the order of Kaufman on demand for $8,000 ($8,808.47) and the assumption by Sherman of certain specified obligations of Kaufman aggregating $1,327.10, making a total of $24,135.57. This amount was paid by Sherman to Kaufman, and was entered on the books of The Mayfair, Inc., in its loans payable account as money owing to Sherman, together with other indebtedness to him upon account of money advanced to the corporation or expended by him for its benefit. The balance owing to Sherman on May 17, 1932, was shown by the books to be $46,227.25. From the commencement of business by the corporation in October, 1930, to May 17, 1932, none of the property of The Mayfair, Inc., appeared on any statement by its accountant or filed with the commissioner of corporations as being encumbered. On December 31, 1931, the statement of the corporation showed total assets of $59,219.76 and the loans payable account on that date

showed a balance of $29,700. On May 17, 1932, The Mayfair, Inc., executed and delivered to Sherman its note for $46,227.25 (which was the amount of its indebtedness to Sherman as shown by its books on that date), payable on demand, and also a mortgage of its personal property covering all the furniture, furnishings, utensils, fixtures, equipment, and all other personal property and assets of every name and nature then owned and possessed by The Mayfair, Inc., in the sum of $46,227.25. The note and mortgage were executed by the proper officers of the corporation duly authorized so to do. No consideration was given by Sherman for the note and mortgage on May 17, 1932, and, other than the preëxisting obligation of the corporation to him as disclosed in the loans payable account, there was none. His purpose in procuring the execution and delivery of the note and mortgage was to protect the assets from the landlord and other creditors. In May, 1932, there were general creditors of the corporation to an amount of approximately $6,000 or $7,000 who had no notice of the encumbrance. After the giving of the note and mortgage, some further advances to or expenditures for the corporation were credited to Sherman upon the loans payable account, so that in October the indebtedness of the corporation to Sherman as shown by this account was $50,806.02. The business of the corporation declined, owing in great part to the withdrawal of Staviski and his orchestra, and in the fall of 1932 the premises were closed until the following summer. On November 1, 1932, Sherman foreclosed the mortgage for breach of condition and sold the property under the power of sale contained in the mortgage. The property was purchased for him by his attorney for the sum of $5,000. At the time of this foreclosure there were accounts payable amounting to $8,000 or $9,000, and after foreclosure the corporation was insolvent. The establishment remained closed until May, 1933, when the premises were occupied by the Club Mayfair, a corporation duly organized, for the purpose of conducting a social club, with Sherman as one of the incorporators and president. The property acquired by Sherman at the foreclosure sale is

used by the Club Mayfair, Inc., but he still retains title and preserves it intact.   One of the purposes of the incorporation was to preserve these assets from the landlord.

Upon these facts the trial judge found and ruled that the execution and delivery of the mortgage and note by the defendant The Mayfair, Inc., to the defendant Sherman, and the subsequent foreclosure sale, constituted a positive and actual fraud upon the creditors of the defendant corporation.   A final decree was ordered, "substantially, in the form prayed for in the bill, with costs, and dismissing the bill as to the defendant Club Mayfair, Inc."

This being a suit in equity, with findings of fact and a full report of the evidence, on appeal to this court it is the duty of this court to decide the case upon its own judgment, giving due weight to the findings made and not reversing them unless plainly wrong.   *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 144.   In such a case the refusal of the trial judge to grant requests for rulings of law is considered as presenting the principles which the appealing party would have this court apply to the performance of its duty to order a correct decree upon the pleadings and evidence, whatever view of the law was entertained by the trial judge.   See *Graustein* v. *Dolan*, 282 Mass. 579, 583–584.

It is not entirely clear upon what principle of law the trial judge made his final rulings, but presumably the facts were found in accordance with his understanding of the applicable principle of law.   The evidence was conflicting and the credibility of the witnesses was important.

The evidence shows that the authorized capital was $50,000, consisting of five hundred shares, par value $100, and the amount then to be issued as three shares;   that these three shares were issued to Staviski, Sherman, and Kabatznick;   that Kabatznick invested no money in the undertaking, the stock being issued to him for expenses incurred in behalf of the corporation;   that the original money to finance the undertaking was to be furnished by Staviski, Kaufman, and Sherman in the proportion of twenty-five per cent by Staviski and proportionately half of the remainder each by Kaufman and Sherman;   that

$30,000 or $40,000 was paid in at the start; that Staviski was to pay $5,000 or $6,000; that Kaufman fitted up the premises and furnished the equipment and put up $10,000 or $12,000; that these original advancements, making up the estimated $30,000 or $40,000, were offset on the books by "loans payable to Mark Sherman"; that in October, 1930, one Max Breen, an accountant and witness in the case, set up some books for The Mayfair, Inc., in which it appeared that there was $300 of stock subscribed and issued which was not paid for and $29,700 subscribed and paid for but not issued; that this item of $29,700 was supposed to represent the original capital investment of the men in the undertaking; that Sherman's original and initial investment in the corporation was $19,156.47; that there appeared an item in the balance sheet representing this investment as "loans payable, Sherman" and that the accountant testified that that amount of money represented the amount advanced by Sherman over and above his capital investment; that this item was posted from the journal and not from the cash receipt book and that it was cash transposed into other items; that the entry of October 28, 1930, shows a debit of the following items: improvements $44,802.19; furniture and fixtures $4,827.71; kitchen equipment $6,099.04; china, glass, and silverware $3,719.63; credits of notes payable, construction $8,965; accounts payable, construction $1,327.10; notes payable $19,156.47; capital stock $300; subscription to capital stock $29,700; that on November 6, 1930, Sherman bought out Kaufman; that the consideration for this transaction totalled $24,135.57; that Sherman agreed to pay Kaufman so much money and assume certain bills of the corporation; that other moneys advanced by Sherman from time to time were credited to the "loans payable account . . . Sherman"; that in the statement of the corporation on December 31, 1931, total assets appeared as $59,219.76 and the loans payable account on that date showed a balance of $29,700, and that there also appeared an item of the amount owed by the corporation to Sherman at $35,627.25; that the capital stock subscribed appeared at $300; that

profits and losses were shared twenty-five per cent to Staviski, one three-hundredth to Mr. Dow, and the balance to Sherman; that after the purchase by Sherman of the interest of Kaufman, with the exception of the $5,000 of Staviski (the exact nature of the appearance of which in the account is somewhat disputed), Sherman had the principal share in The Mayfair, Inc.; that no one other than Sherman advanced any money to the corporation after it was formed.

According to the evidence, if Kaufman's interest was $24,135.47 and Staviski contributed $5,000 or $6,000 this would just about make up the amount of $29,700, which appeared on the balance sheet of October, 1930, as subscribed capital stock. This was stated in substance to represent the original capital investment of the three men. But none of it could have been Sherman's as a mere matter of numerical calculation. These advances were originally carried in the "loans payable, Sherman" account before they appeared in the books as set up, in the subscribed capital account. Sherman's original and initial investment of $19,156.47 appeared in its "loans payable, Sherman" account at all times. Other advances to the corporation by Sherman appeared in this loan account payable to him. Then he bought out Kaufman's interest within a very short time after The Mayfair, Inc., had opened. While Kaufman's interest presumably appeared in this account of October, 1930, as capital subscribed, he seems rather to have stood at least to some extent in the position of a creditor of the corporation. He is spoken of as the contractor who furnished the equipment. Sherman, when he bought Kaufman's interest, agreed to pay him so much money and assume certain bills of the corporation. The trial judge found that "The premises at 54 Broadway were fitted up for occupancy by one Kaufman to whom the corporation became indebted for considerable sums, and on or about November 6, 1930, an agreement was entered into by which Kaufman by assignment conveyed to Sherman all his claims against The Mayfair, Inc., and gave to

Sherman a bill of sale of all his right, title and interest in and to all personal property on the premises in consideration of a cash payment by Sherman . . . ." Kaufman never received a share of stock and no reason is suggested why this alleged capitalization was never represented by shares. After Sherman had bought out Kaufman, presumably he stood in Kaufman's place so far as that interest was concerned. Sherman then appeared as a creditor to the full extent of all the moneys which he had advanced. The trial judge found that "This amount [$24,135.47] was duly paid by Sherman to Kaufman, and was entered on the books of The Mayfair, Inc., in its loans payable account as money owing to Sherman, together with other indebtedness to him upon account of money advanced to the corporation or expended by him for its benefit." In the statement of the corporation of December 31, 1931, the loans payable account on that date showed a balance of $29,700 and the capital stock with a par value, $300. This presumably covered the Kaufman interest which had been bought out as well as the Staviski interest, but Sherman standing in Kaufman's place now appears as a creditor of the corporation to the extent of that interest, $24,135.47, as well as a creditor of other loans payable to him to the extent of $35,627.25. The capital interest in the corporation appeared at $300. Sherman then had the entire interest in the corporation (including the $5,000 which was alleged to have been put up by Staviski) appearing as loans payable to himself in one way or another. He had no apparent capital stake whatsoever and no real capital stake appeared as actually having been put into the corporation save as it was alleged to have appeared in the subscription to capital stock at $29,700. With this capital structure, Sherman was to get seventy-five per cent of the profits of the corporation, and at the same time he was appearing as a creditor to the full extent of moneys advanced by him which made up practically the entire amount invested in the company with the exception of the $5,000 or $6,000 alleged to have been put up by Staviski, but which must

have appeared in the statement of December, 1931, as a loan payable, and the $300 subscribed capital stock which appeared on that statement.

If the evidence and the findings by the trial judge justified a conclusion that only three shares of the defendant corporation were ever subscribed for and that with the exception of the $5,000 alleged to have been advanced by Staviski all advances which were made by Sherman were loans and intended as such by him, then he, being an officer of the corporation, could not compete with legitimate creditors of the corporation in the distribution of its assets. For this reason the decree of the court below was right.

This court adheres to the usual rule that ownership by a person of all the stock of a corporation does not warrant disregarding the corporate entity and does not fasten on such person liability for the obligations of the corporation. *Berry* v. *Old South Engraving Co.* 283 Mass. 441, 450–451, and cases cited. Circumstances sometimes exist which permit a sole stockholder to prove his claim against the corporation in competition with other creditors, *Salomon* v. *A. Salomon & Co. Ltd.* [1897] A. C. 22, *Wheeler* v. *Smith*, 30 Fed. Rep. (2d) 59, 61, *H. E. Briggs & Co.* v. *Harper Clay Products Co.* 150 Wash. 235, but here Sherman tried to run the business which required expenditures of well over $75,000 on a stock investment of $100 by himself and possibly $5,000 or $6,000 by another. He entirely controlled the affairs of the corporation, and was in no proper sense a creditor, but was an owner of a substantial part of it. See *Luckenbach Steamship Co. Inc.* v. *W. R. Grace & Co. Inc.* 267 Fed. Rep. 676, 681. Such stockholder furnishing the capital necessary to the size of the corporation as a loan cannot in the circumstances of this case gain a preference over creditors in the distribution of the assets. *Clere Clothing Co.* v. *Union Trust & Savings Bank*, 224 Fed. Rep. 363. *New York Trust Co.* v. *Island Oil & Transport Corp.* 56 Fed. Rep. (2d) 580, 583. *S. G. V. Co.* v. *S. G. V. Co.* 264 Penn. St. 265.

If Sherman is not to be regarded as a legitimate creditor

of the corporation, manifestly the note and mortgage should be set aside. Sherman likewise would have no right to come in and prove his claims to the detriment of other creditors.

If Sherman is regarded as a legitimate creditor, the decree of the court may be justified for the further reason that the facts call for the application of the rule established by the great weight of authority that directors of a corporation which is insolvent or about to become so cannot obtain for themselves a preference over other creditors in respect to the assets by taking a mortgage or other security for preëxisting debts. *Stuart* v. *Larson,* 298 Fed. Rep. 223. *Jackman* v. *Newbold,* 28 Fed. Rep. (2d) 107, 111. *Mica Products Co.* v. *Heath,* 81 N. H. 470. *Symonds* v. *Lewis,* 94 Maine, 501. *Gantenbein* v. *Bowles,* 103 Ore. 277, 289. The rule has been placed on the basis that directors are to some extent trustees of the corporate property for the creditors, and that they should not be allowed to use their superior and far more intimate knowledge of the corporation's affairs to the detriment of creditors. There is no finding directly to the effect that the corporation was insolvent at the date of the giving of the mortgage, but that the corporation did not have sufficient assets or prospects of credit to meet the claims of those to whom it was indebted may fairly be inferred from the finding that Sherman's "purpose in procuring the execution and delivery of the note and mortgage was to protect the assets from the landlord and other creditors." Staviski, whose orchestra was the principal attraction, refused to work in person after conducting the music for the first season, from October, 1930, and as a consequence the business had fallen off considerably. Sherman testified that the mortgaged property was worth much less than $46,000 at the time the mortgage was given. In May, 1932, there were general creditors of the corporation to an amount of approximately $6,000 or $7,000 who had no notice of the encumbrance. After foreclosure of the mortgage there was about $1,000 to satisfy claims amounting to $8,000 or $9,000 in addition to what-

ever was owed Sherman. There was no doubt about insolvency then. It is clearly inferable, therefore, that the mortgage was given at least with insolvency in mind and with an intention of obtaining a preference in the assets when that event should occur.

Although Sherman testified that he advanced about $2,000 to the corporation after obtaining the mortgage, it was found by the trial judge that the only consideration was the preëxisting debt as disclosed on the books. Certainly the giving of the mortgage was not part of a transaction putting new money into a corporation or part of any arrangement looking to the carrying on of the business in a rational expectation and hope of ultimate success. The case at bar is in this respect to be distinguished from *Holt* v. *Bennett*, 146 Mass. 437, where it was held that payments to directors of money borrowed from them made in the usual course of business, and not in view of the probable insolvency of the corporation, and while it expects in good faith to proceed with its business, are not frauds upon the other creditors and cannot be recovered by them from the directors to whom such payments were made. *Sanford Fork & Tool Co.* v. *Howe, Brown & Co. Ltd.* 157 U. S. 312, 318. See also *Cosmopolitan Trust Co.* v. *S. L. Agoos Tanning Co.* 245 Mass. 69, 73.

If the evidence established a loan to the corporation, Sherman could not as against creditors of the corporation enforce the mortgage, because it confessedly was given with actual intent to hinder, delay and defraud creditors of the corporation. G. L. (Ter. Ed.) c. 109A, § 7. *Crowninshield* v. *Kittridge*, 7 Met. 520. *Dondis* v. *Lash*, 277 Mass. 477. If the evidence established a loan and mortgage without actual intent to defraud creditors of the corporation, the corporation could not secure Sherman, its treasurer and one of its board of directors, in preference to other creditors. See cases above cited. If the evidence established not a loan to the corporation but a capital contribution, Sherman was not a creditor of the corporation and the mortgage given to secure his interest was void. In any view of the

evidence the mortgage was void as against creditors of the corporation.

It is unnecessary to consider the exceptions in detail. They disclose no reversible error.     .

*Exceptions overruled.*
*Decree affirmed with costs.*