## BROWN v. FREEDMAN.

### No. 3742.

Circuit Court of Appeals, First Circuit.

March 4, 1942.

Joseph B. Wolbarsht, of Boston, Mass., for appellant.

Arthur J. Santry, of Boston, Mass. (Frederick Fish, of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, JJ.

WOODBURY, Circuit Judge.

This is an appeal under Section 24, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 47, sub. a, from an order of the District Court affirming an order of a referee in bankruptcy sustaining a petition to reclaim and repossess certain machinery, and directing the defendant named therein, the appellant here, as trustee in bankruptcy of the International Chewing Gum Company, to turn over the proceeds of the sale thereof to the appellee.[1]

The appellee Freedman, the petitioner below, is a member of the Massachusetts Bar.

---

[1] By stipulation the machinery claimed in the petition was sold by order of the court and the proceeds held in escrow pending final determination of the title thereto.

In 1937, and for some years prior thereto, he was counsel for the National Chicle Company, a corporation engaged in the business of manufacturing chewing gum. In the course of his duties he became very friendly with that corporation's vice-president and sales manager, one Alvin S. Livingston. In 1937 the National Chicle Company became involved in financial difficulties; an attempt to reorganize it under Section 77B of the Bankruptcy Act, 11 U. S.C.A. § 207, failed; an order of liquidation was entered against it; and on July 17 of that year its machinery and assets were sold at public auction. At this sale Freedman purchased the machinery of the bankrupt for $20,460.30, and this is the property which in this proceeding he seeks to reclaim and repossess.

It appears that Freedman's purchase was made at the instance of Livingston, who wished to continue in the gum manufacturing business, and that it was made in accordance with an understanding between Freedman and Livingston whereby each was to contribute approximately $5,000 to a new corporation which they were to form for the purpose of entering the gum candy business. Accordingly on July 20, 1937, Freedman formed a Massachusetts corporation called the International Chewing Gum Company (it will be referred to hereafter simply as the Company) with Livingston as president and treasurer and himself as counsel. As organized the Company's directors were Livingston, one Phillips, who subsequently became the Company's manufacturing superintendent, and Miss Madaline Dunne who was Freedman's secretary.

The Company began business operations on the premises in Cambridge formerly occupied by the defunct National Chicle Company, and Freedman, without ever having removed his machinery from those premises, permitted the Company to use it. From time to time as need arose, Livingston and Freedman made cash advances to the Company, which eventually totalled approximately $12,000. At first these advances were listed on the Company's books as debts, but eventually, to conform with the original understanding of the parties, these entries were changed and stock in the Company was issued in payment therefor.

In view of the issues raised by this appeal, we quote the actual words used by the referee to describe the events which followed.

"During the six months following the inception of the new enterprise several attempts were made by Livingston, in which Freedman may or may not be said to have actively participated, to raise substantial capital from third parties both to provide funds for working capital and to take over from Freedman the aforesaid machinery and equipment. As time went one and it became increasingly apparent that a large part of the hoped for new capital would not materialize, the problem of the machinery purchased by Freedman and being used by the corporation became uppermost in the minds of those most directly concerned. Discussions ensued between Freedman and Livingston on the subject, resulting in the execution on December 27, 1937, of a conditional sales contract between Freedman as party of the first part and said corporation as party of the second part, whereby all said machinery was sold by Freedman to the corporation for the price paid for same by Freedman, title to remain in Freedman until the corporation met in full the payments and other conditions called for under said contract.

"On the day prior to the execution of said conditional sales contract, one Seiden, an outsider, had been prevailed upon to subscribe to $6500 of new stock of the corporation and had handed his check for $3000 to Livingston as part payment therefor. Whether or not Seiden knew at this time of the existence of said conditional sales contract is in dispute, but it is clear that he afterwards paid up the balance of $3500 of his subscription with full knowledge of the situation and having obtained representation on the board of directors.

"Following the execution of said conditional sales contract, further discussions were held from time to time with the result that a modification of said agreement was executed March 2, 1938, at a time when it is clear that all parties with capital investments in the corporation were in full possession of the facts with respect to the ownership of the machinery claimed by Freedman and no question was then raised as to the validity of the agreement. On behalf of creditors, evidence was submitted by the respondent to the effect that during the period following the formation of the corporation and the subsequent execution of the conditional sales contract, the petitioner represented or assented to representations by Livingston that the machinery owned by him in fact belonged to the cor-

poration. I find that such representations were not at any time made by the petitioner nor did he authorize others directly or by implication to make them for him.

"I further find that no creditor was shown to have advanced substantial credit on any such representations nor has it been proven to my satisfaction that any of the claims in existence on the date of bankruptcy, namely, April 10, 1939, were outstanding on the date of the execution of the conditional sales contract or the modification thereof. * * *

"The machinery was purchased by the petitioner personally and was never listed on the bankrupt corporation's balance sheets or statements until after the execution of the conditional sales contract; the machinery was insured by the petitioner personally in his own name and not until after the conditional sales contract was executed did the insurance papers show the corporation to have any interest therein; the first certificate of condition filed by the corporation, August 8, 1938, clearly set forth the fact that the machinery was held under a conditional sales contract; the conditional sales contract was duly authorized by the board of directors by unanimous vote at a meeting held for that specific purpose and that purpose alone, and the modification thereof was later authorized, also by unanimous vote of the directors, at a meeting held for the transaction of important corporate business; payments were made by the corporation in accordance with the terms of said conditional sales contract and modification thereof for more than a year after their execution; according to the corporate books the corporation was solvent upon the dates of the execution of the conditional sales contract and the modification thereof and remained so until sometime in 1939."

"Even such evidence offered by the respondent as was undisputed did not, in my opinion, disprove the petitioner's contention that the machinery in question was merely loaned and not donated to the corporation as a capital contribution."

The appellant contends in substance that on the evidence in the record it must be found that Freedman turned his machinery over to the Company not as a loan but as a capital contribution, and that even if he did not do so, established rules of law prevent him from now being heard to contend otherwise. Specifically, the points upon which the appellant relies in this appeal

are that neither the referee's findings of fact nor his order are supported either by the evidence or the weight of the evidence; that the referee's conclusions of law are erroneous; that his failure to report any findings at all on eight specified issues advanced by the appellant "manifests a patent misconception" of the issues before him; that his characterization of Livingston as the "chief witness for the respondent herein" indicates "a distorted emphasis of the testimony adduced by the appellant"; that the referee erred in rejecting seven specified "contentions of law and fact" advanced by the appellant; and that he committed five errors, also specified, in admitting, and one error in excluding, testimony. As to the District Court, the points relied upon are that its order confirming the order of the referee "constituted an affirmation of the errors of the referee herein specified"; and that it also erred in affirming the order of the referee and in failing to order that the petition be dismissed.

Counsel for the appellant, both in his brief and in argument before us, evinces a misconception of the scope of judicial review in cases of this sort. In his brief he says that the District Court "may disregard the findings of the referee even where the review shows only a difference as to the credibility of witnesses", and with reference to this court he says, "The view that concurrent findings of a referee and the court shall not be reversed if not clearly erroneous is not applicable in this appeal." We believe counsel to be in error because the scope of the review by a District Court of findings of fact made by a referee is established by Order No. 47 of the General Orders in Bankruptcy, 11 U.S.C.A. following section 53, and the scope of our review of a District Court in cases like the present is established by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Order No. 47, supra, provides that the District Court "shall accept his [a referee's] findings of fact unless clearly erroneous", and Rule 52(a), supra, provides that we shall not set aside a District Court's finding of fact "unless clearly erroneous". The applicability of Order No. 47 of the District Court in this case is obvious. The applicability to us of Rule 52(a) is by force of Rules 1 and 81(a) of the Federal Rules of Civil Procedure, and Orders No. 36 and 37 of the General Orders in Bankruptcy.

See Katcher v. Wood, 8 Cir., 109 F.2d 751; Coursey v. International Harvester Co., 10 Cir., 109 F.2d 774; Scott v. Jones, 10 Cir., 115 F.2d 133.

Therefore, whatever the rule may formerly have been, the scope of our review of findings of fact made by a referee and adopted by a District Court is now narrowly limited. The question for us in this case is whether the District Judge committed clear error in accepting the referee's findings of fact for the reason that he was unable to say that those findings were clearly erroneous.

Counsel for the appellant also contends that the findings are clearly wrong. He argues first that they do not comply with Order No. 47 in that no written findings at all were made on eight issues said by him to be of controlling importance, and second, that many of the findings made are not supported by the evidence and thus are so clearly erroneous that it was clear error for the District Court to have adopted them. We do not agree with either proposition.

▉ The referee filed a report in which he stated his findings of fact, some of which we quoted above. The District Court affirmed these findings thereby adopting them as its own. It cannot be doubted that this procedure is in conformity with Order No. 47 of General Orders in Bankruptcy. If the findings made do not cover the eight specified issues of fact enumerated by appellant's counsel in his points of appeal (point 6, paragraphs (a)-(h) inclusive), he cannot now be heard to complain. The reason for this is that he enumerated these identical issues in his petition to the District Court to review the referee's order, and the referee in his certificate to the District Judge on this petition made the following comment: "The petitioner and his counsel at no time made any request for findings of fact. At a subsequent hearing on a petition to stay the proceedings I asked Mr. Wolbarsht if he would like me to make additional findings of fact on the issues set forth in 6 (a)-(h) inclusive and he politely declined, saying in substance that he wanted no change in the record. I am of opinion that I made findings in the most important questions raised; and I may state frankly that had I made findings on the issues referred in 6(a)-(h) inclusive they would have been adverse to the petitioner."

In our view it requires no extended argument to show that it would be grossly unfair to the appellee to permit the appellant, after having made no requests for findings of fact and after having informed the referee that he wished no additions made to his report, to be allowed now to prevail on the ground that the report is incomplete. We therefore pass on to the question of the sufficiency of the evidence to support the findings as they stand.

▉ An examination of the record discloses that the testimony is hopelessly conflicting upon almost every issue. Under these circumstances it was the referee's duty to determine what to believe and what to reject and since he saw the witnesses and heard them testify, he is in a far better position to do this than we are. In performing this duty he found that Livingston, who the record discloses was in fact the appellant's chief witness, "could not be believed", and that his testimony was entitled to "little weight". We cannot dispute the referee's conclusion with respect to Livingston's veracity, nor would we be disposed to do so if we could, because the record discloses ample support for the referee's conclusion.

We might go on and consider each factual issue raised separately and in detail, but to do so would expand this opinion out of all proportion to the importance of the questions presented. It suffices to say that a careful examination of the record discloses ample testimonial support for each conclusion of fact reached by the referee. From this it follows that the referee's report must be regarded as embodying a correct statement of the facts.

This conclusion with respect to the report cuts the ground from under a large part of the appellant's argument on questions of law. For instance, his lengthy argument that Freedman is estopped to assert his title, which he bases upon the proposition that the referee should have found that Freedman represented that the Company owned the machinery, is wholly beside the point for the reason that the referee has found, as we conclude properly, that Freedman never so represented, or knew or consented to any such representation by Livingston or anyone else.

▉ Furthermore the referee found that no creditor advanced credit to the Company on such unauthorized representations as to the ownership of the machinery as Livingston may have made. This finding

was made on conflicting testimony, but even if it had not been so made—even if it had been based upon the referee's disbelief of uncontradicted testimony—the appellant's position would not be improved. A referee, like any judicial fact-finder, is within his rights in disbelieving testimony of this sort, even when it is undisputed (Rasmussen v. Gresly, 8 Cir., 77 F.2d 252; Forbush Co. v. Bartley, 10 Cir., 78 F.2d 805), and when he does so there is a vacuum in the proof which requires that the issue involved must be decided against the party having the burden of proof, in this case the appellant. "Estoppel depends on facts, and the party claiming estoppel has the burden of proving the facts necessary to establish it." United States v. Dickinson, 1 Cir., 95 F.2d 65, 68. All that appears then, so far as the question of estoppel is concerned, is that the machinery was in the possession of and was being used by the Company and it has been repeatedly held that no estoppel against the true owner arises from these facts alone. In re John J. Kingsley, Inc., D.C., 8 F.Supp. 303, affirmed sub nom. Nathanson v. Worcester Bank & Trust Co., 1 Cir., 73 F.2d 889, and authorities cited.

■ In addition to estoppel the appellant argues that since Freedman was the principal stockholder, and since it must be found from the testimony that he controlled a majority of the nominal directors and thus was in control of the Company, he acted in a fiduciary capacity with respect to it, and therefore his transactions with it must be subjected to rigorous scrutiny and his claim disallowed or subordinated to the claims of other creditors if these transactions were in any way inequitable or unfair. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. Assuming, without deciding, that the facts call for the application of the rule contended for, and therefore subjecting Freedman's dealings with the Company to searching scrutiny, we find no unfairness or inequity therein. It cannot be said to have been inequitable or unfair for Freedman to have permitted the Company to use his machinery; and since he bought it at public auction and sold it to the Company on time payments for its purchase price, we cannot say that the contract of conditional sale was tainted with anything resembling either fraud or over-reaching.

■ The appellant also contends that in equity the machinery should be treated as in effect a capital advance by Freedman to the Company. He bases this contention upon the case of Albert Richards Co. v. The Mayfair, Inc., 287 Mass. 280, 191 N.E. 430, cited in Pepper v. Litton, supra [308 U.S. 295, 60 S.Ct. 246, 84 L.Ed. 281], in support of the statement therein to/ the effect that "so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder * * * where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan."

This contention is without merit for the reason that the facts do not call for the application of the rule contended for. While it is true that as originally organized the Company's capitalization amounted to but $15.00, it is also true that as time went on and as need arose, both Freedman and Livingston made substantial capital contributions to it. To be sure these contributions were at first entered on the Company's books as loans, but these entries do not appear to have been made in accordance with the intention of the contributors, which definitely appears to have been that their advances were to be capital contributions. That this was in fact their intention is apparent because neither of them ever made any claim to recover those advances on the ground that they were in fact loans.

Thus, looking at the factual situation, the Company's capital stock at the time of the execution of the conditional sale was not $15.00 but either approximately $12,000 or approximately $15,000 depending upon whether Seiden's payment on December 26, 1937 of $3,000 on account of his capital contribution is considered or not. While the Company's capitalization may have been inadequate it was certainly not "purely nominal" and thus the rule contended for does not apply.

■ From what has been said concerning the capital contributions of Livingston and Seiden it is evident that the corporate fiction cannot be disregarded and Freedman's claim disallowed on the ground that the Company was but Freedman's alter ego, or "corporate pocket". Pepper v. Litton, supra. Freedman was not by any means the only person with a substantial stake in the corporation. From the start

Livingston was interested in it almost as much as Freedman and later, when the contract of conditional sale was amended, Seiden, who had already made a substantial investment, was represented by his attorney on the board of directors. It clearly appears that the Company was not of the "one man" variety.

■ The other points of appeal upon which the appellant originally relied have not been briefed or argued and we assume that they have been abandoned.

Since the referee's and District Court's findings "that the machinery in question was merely loaned and not donated to the corporation as a capital contribution" is not clearly erroneous, and since no legal impediment exists to bar Freedman from reclaiming his machinery from the trustee in bankruptcy, it follows that

The order of the District Court is affirmed, with costs to the appellee.