Warren G. SCHWARTZ, Trustee, (by substitution) Respondent, Appellant,

v.

J. R. CIANCHETTE & SONS CORP., et al., Appellees.

No. 6159.

United States Court of Appeals
First Circuit.

Heard May 4, 1966.

Decided June 28, 1966.

Julius Zizmor, New York City, with whom Schwartz & Duberstein, Brooklyn, N. Y., was on brief, for appellant.

Frederick G. Fisher, Jr., Boston, Mass., with whom Carl Hirsch and Hale & Dorr, Boston, Mass., were on brief, for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This appeal stems from the failure of one Joseph Halpern [1] to complete the purchase of certain business property located in Bangor and Glenburn, Maine, which he agreed to buy from the appellees, J. R. Cianchette & Sons Corp. and Joseph R. Cianchette, debtors in possession under a Chapter XI arrangement. Three properties are involved in the sale—two in Bangor known as the Union Street and the North Bangor sites, and a third in Glenburn. The total purchase price is $85,000 of which the buyer made a down payment of $8500. The sellers' business affairs being under the supervision of the Bankruptcy Court, the sale required the approval and confirmation of the referee in bankruptcy, which the sellers promptly obtained.[2] Shortly thereafter, the buyer refused to complete his purchase [3] and the sellers brought a petition in the Bankruptcy Court to compel him to do so. The buyer countered with a cross petition for the return of his deposit and for reimbursement of certain expenses paid by him for abstracts of title to the real estate involved in the sale.[4] In the nearly three years that followed, four hearings were held by the referee in bankruptcy and his findings of fact in each of these hearings were reviewed and affirmed by the district court. From each of the four orders entered by the district court affirming the referee's findings the buyer appeals.[5]

At the initial hearing the buyer's basic contention was that he is relieved of his obligation to complete the purchase (1) because he is being called upon to accept substantially less acreage in the Union Street site than the sellers had agreed to convey, and (2) that on the date the sale was confirmed the seller was not in a position to deliver good and merchantable title.

The acreage issue raises substantial questions of fact and law which were discussed by the referee at some length. The buyer relies principally upon a clause in his offer which refers to the Union Street site as "consisting of 70 acres more or less."[6] It appears that the entire Union Street site consists of some sixty-six acres including thirteen house lots with an area of about one acre each. The remaining portion is industrial property which had been used by the sellers in

---

1. Halpern was the original respondent-appellant but having gone into bankruptcy during the pendency of these proceedings, Warren G. Schwartz, his trustee in bankruptcy, was substituted as appellant.

2. The offer was made on July 18, 1961, accepted in writing on July 25 and the sale was confirmed by the referee on August 11, 1961.

3. During the six weeks period between the date of his offer, and early in September when he repudiated the sale, the buyer had the keys to some of the buildings, readied some of them for use, made minor repairs and acted generally, as though he were the owner.

4. The agreement of sale required the sellers to furnish these abstracts which they did not do and the buyer obtained them at his own expense.

5. These four appeals have been consolidated and are being heard together by order of this court.

6. The order confirming the sale contains the same language.

connection with their former business.[7] Located thereon is a stone quarry, a stone crusher and some accessory buildings. This industrial portion contains about fifty-three acres. The sellers contend that this is the only portion of the site involved in the sale. The buyer claims he is entitled under his contract to sixty-six acres.

The following evidence was adduced on this issue. On July 3, 1961, some fifteen days before the buyer made his offer, he, an attorney for the sellers, and a consulting geologist made an inspection of the Union Street property. The geologist pointed out the boundaries of the industrial portion. The attorney stated he was uncertain of the exact acreage but gave the buyer two deeds covering the entire site which the sellers had received when they bought this property. The buyer was aware of the total acreage recited in these two deeds and took them with him to read leisurely that evening.[8] While at the site the attorney for the sellers told the buyer that the house lots were not included in the sale.[9] A few days later, but still well before the time the buyer submitted his offer, one of the sellers gave him a detailed map of the Union Street property on which he pointed out the boundaries of the industrial portion of the property. On the basis of this evidence the referee found that under the circumstances any disparity in acreage in the Union Street property was of no material consequence; that there was not the slightest evidence of any misrepresentation of the acreage by the sellers and any mistake with reference to it was entirely the fault of the buyer.

In support of his contention of unmerchantability, the buyer alleged certain insufficiencies of title and numerous specific deficiencies in the conduct and confirmation of the sale. The referee rejected the claim of insufficiency of title and made a seriatim disposition of the objections raised to the sale [10] as trifling and inconsequential. He also made an overall finding applicable to both issues that the dealings of the parties constituted a judicial sale, the finality of which he would not disturb in the absence of substantial grounds. Thereupon the referee denied the buyer's motion for refund of his deposit, allowed him reimbursement of his title expenses in an amount to be determined, and ordered the buyer to complete his purchase. On review, the district court affirmed the referee's findings but ruled that under his

---

7. Prior to the Chapter XI proceeding, the sellers were in the highway and airport construction business and used this portion of the Union Street site and the other properties involved in this case in connection with their business. The North Bangor ·site which is under lease to the sellers for an indefinite period, contains about three acres. On it is a railroad siding, accessory buildings and some stockpiled materials. At Glenburn the sellers have a twelve acre tract known as the B & A Pit on which there are sand and gravel deposits. They also have a leasehold interest in other property in the same vicinity called the Braley Pit which contains similar deposits and is included in the sale. There is evidence that the buyer intended to use these properties for the same general purposes as the sellers had used them.

8. The deeds showed a total acreage of 66.12 acres in the entire site. One deed recited 46.75 acres—the other 19.37 acres. In addition, both had metes and bounds descriptions of the parcels conveyed.

9. In fact most of these house lots had already been sold and the sales confirmed by the bankruptcy court. Also it should be noted that these lots were under the control of the liquidating agents and the debtors in possession had no authority to sell them.

10. Amongst others, the buyer raised the following objections to the sale which were dismissed by the referee: (a) that the sellers had only thirty days to close the sale and did not do so within that period; (b) that the sellers did not pre-pay the rent or prorate taxes as agreed; (c) that the sellers did not obtain a written consent from the lessor relative to lease rights enjoyed by the sellers; (d) failure of sellers to furnish abstracts of title as agreed; (e) technical defects in referee's confirmation of the sale and (f) the sale did not comply with the Statute of Frauds in that it lacked a sufficient memorandum in writing.

agreement the buyer is entitled to take these properties free and clear of any encumbrances that would render them unmerchantable and recommitted the case to the referee for such a finding.

This necessitated the second hearing. At this hearing the sellers produced evidence that the title to each of the properties involved was good and merchantable as of the date the sale was confirmed.[11] The buyer offered no evidence. The referee found that the sellers "are now in a position as indeed they have been at all relevant times in the past, to convey a good and merchantable title to these premises." In this second hearing the referee also took occasion to reaffirm his previous findings, again ordered the buyer to complete his purchase and in the event he failed to do so, authorized the sellers to resell the property for the buyer's account and hold him liable for any resulting deficiency.[12]

More than two years having passed since the sale was confirmed and the buyer still not having completed his purchase, the sellers succeeded in obtaining another purchaser for part of the property and petitioned the referee to confirm the resale. While this was pending it was discovered that the sellers' lease to the Braley Pit which was involved in the resale, had never been recorded and that the fee in the property had since been sold to a bona fide purchaser who recorded his deed apparently without actual notice of the lease. Neither party had any previous knowledge of this defect and it was the first time it had been called to the attention of the referee.

The case, which was then pending in this court, was promptly remanded to the district court and from there was again sent to the referee for a determination of title. At this hearing the original buyer strongly urged that the previous orders directing him to complete his purchase be vacated since it was clear that the sellers had no title to a material portion of the properties when the sale was confirmed.[13] The sellers testified that when this defect became known to them they cured it promptly by purchasing the fee.[14] The referee found that this made the title fully marketable; that time not being of the essence of the agreement, once the defect was discovered the sellers were entitled to a reasonable opportunity to cure it as long as this did not result in any hardship to the purchaser; that since the original purchaser had long ago decided not to complete his purchase, this belated action was not harmful or prejudicial to him.[15] Shortly thereafter, this matter came before the referee and the district court for the fourth time—this time on the sellers'

11. In addition to other evidence, a title expert testified that with two possible exceptions, no liens or encumbrances rendering the title unmerchantable existed against these properties as of September 15, 1961. It appeared that these two possible liens had been discharged but in any event they were susceptible of money satisfaction and could have been paid out of the proceeds of the sale on the day of the closing.

12. The referee also provided that within thirty days of the completion of the resale, the sellers are authorized to make application for an award of damages against the respondent in such amount as the bankruptcy court shall determine just and proper. The buyer did not obtain a stay of this order.

13. He also contended that in view of the pending resale it was futile to compel him to complete the purchase and in addition, that this case had now become an action for damages for breach of contract. See fn. 12.

14. And introduced in evidence a deed dated January 6, 1964, showing a conveyance to them of the fee in the Braley Pit by the then record owner of this property.

15. We are not impressed with the buyer's argument that this title defect was cured solely for the benefit of the new purchaser and not for him or by his contention that he should be relieved of his obligation to purchase because the properties had deteriorated and depreciated in value due to the delay caused by this litigation. Much of this delay was caused by the dilatory tactics of the buyer.

amended petition for confirmation of the resale, which was granted.

■■■ It is well settled that the district court is bound by the referee's findings of fact unless they are clearly erroneous and this court, in considering the district court's findings of fact, is bound by the same rule. Brown v. Freedman, 125 F.2d 151, 154 (1st Cir. 1942). We have reviewed the findings of fact made by the referee and the district court and we cannot say they are clearly erroneous. The finding that only the industrial portion of the Union Street site was involved in the sale is certainly supported by substantial evidence. The buyer knew or should have known that only the industrial portion was included. He was so informed the day he viewed the property. The boundaries were visibly pointed out to him that day and were shown to him on a map a few days later.[16] This finding is further buttressed by the fact that the buyer had intended to use the property for the same general purposes for which the sellers had used it and that most of the house lots had already been sold and the sales confirmed by the bankruptcy court.

■■■ There is absolutely no evidence of any fraud or misrepresentation of any kind having been practiced by the sellers and there is ample evidentiary basis for finding that any mistake with reference to the acreage was unilateral and not the fault of the sellers. Such mistake does not excuse the buyer from performance. Staley v. Dwyer, 29 F.2d 982, 984 (8th Cir. 1928); Bibber v. Carville, 101 Me. 59, 63 A. 303 (1905). Also there is sufficient evidence to support the findings of the referee and the district court that

the numerous title and other objections raised by the buyer were untimely,[17] were also without merit and that the title to these properties is fully marketable. In fact the district court properly characterized most of the buyer's objections as "patently specious."

From a review of all the evidence it is clear that the buyer's repudiation of his contract was for reasons wholly unrelated to the quality of the title and as pointed out by the district court, there was ample evidence to support such a finding.

■■■ To be sure, the referee's finding of merchantability made in the second hearing[18] turned out to be erroneous with reference to the Braley Pit, but this finding was made solely upon the basis of the evidence presented.[19] It should be noted, however, that this defect was not known or discovered by the buyer or relied upon by him as a ground for repudiation of the sale. When it came to the attention of the sellers, they cured it promptly and no hardship or prejudice to the buyer resulted. His attempt to use it now as a device to avoid his agreement does not impress us. Higgins v. Eagleton, 155 N.Y. 466, 50 N.E. 287 (1898). See 3A Corbin on Contracts (1960) § 762. Moreover, he had repudiated his contract long before he learned of this defect. A buyer who intends to assert such defects as grounds for repudiation of an agreement of sale must bring them to the attention of the seller so that he may have a reasonable opportunity to cure them. 3 American Law of Property § 11.51 (Casner Ed. 1952). This was not done here. From our appraisal of the sellers' conduct in this case we are satisfied that

16. See Berry v. Berry, 288 Ky. 239, 156 S.W.2d 123 (1941); Landers v. Scroggy, 294 Ky. 848, 172 S.W.2d 557 (1943).

17. No title objections of any kind were raised by the buyer in September of 1961 when he first indicated his intention to repudiate the sale or in his answer to the sellers' petition to compel him

to complete the purchase. At the confirmation hearing before the referee, buyer's son was present and he raised no objections of any kind.

18. And approved by the district court.

19. It cannot be expected that the referee had any obligation to make an independent title examination of these properties.

if the buyer had given them timely notice of the title objections which he later asserted in these proceedings, the sellers would have promptly cured them.[20]

 Where a seller has not been at fault and time is not of the essence of the agreement, he has the right to clear defects and perfect title during the specific performance proceedings as long as this does not result in hardship or prejudice to the buyer. 3 American Law of Property § 11.51 (Casner Ed. 1952); Pomeroy, Specific Performance of Contracts, § 421 (3d Ed. 1926). Both the referee and the district court found that the sellers were not at fault here; that time was not of the essence of this transaction and that since the buyer had long ago elected not to complete his purchase for reasons unrelated to the objections he asserted, he was not harmed or prejudiced by the belated curing of this title defect in the Braley Pit property. These findings are not clearly erroneous. There was ample evidence to support them. In fact the buyer's unwarranted attempt to escape his contractual obligation seemed to permeate the whole case.

Finally, it must be remembered that the sale with which we are concerned in this case is a judicial sale. In re United Toledo Co., 152 F.2d 210, 211 (6th Cir. 1945); In re Hollingsworth & Whitney Co., 242 F. 753, 756 (1st Cir. 1917); In re California Eastern Airways, 95 F. Supp. 348, 351 D.C.Del. 1951). The parties are acting under the supervision of the bankruptcy court. It cannot be denied that the buyer knew this. Judicial sales are not governed by the ordinary rules pertaining to private sales of real and personal property. It has long been established that they enjoy a certain favor in the law and every reasonable intendment must be made in favor of their validity. Cox v. Hart, 145 U.S. 376, 12 S.Ct. 962, 36 L.Ed. 741 (1892). In the absence of substantial grounds, we are reluctant to disturb the finality of a judicial sale. Currin v. Nourse et al, 66 F.2d 137, 140 (8th Cir. 1933); In re Hoffman et al, 16 F.2d 939, 940 (D.C.E.D. Pa. 1927). We find no such substantial grounds here.

Affirmed.

---

20. The district court found that all defects of which the buyer complained in the first hearing were cleared before the end of the second hearing.