HENRY FRIEDMAN, trustee in bankruptcy, vs. EDWARD
KURKER.

Suffolk.  April 21, 1982. — July 15, 1982.

Present: GREANEY, CUTTER, [ DREBEN, JJ.

*Practice, Civil*, Findings by judge. *Evidence*, Business record. *Corpora-
tion*, Officers and agents, Stockholder's withdrawal of funds.

Two general ledgers of an insolvent corporation, which were admitted in
    evidence as business records at the trial of an action to recover funds
    alleged to have been wrongfully withdrawn from the corporation by
    its president and sole stockholder, were evidence in the case for all pur-
    poses, notwithstanding testimony that the ledgers may have been inac-
    curate in some respects.  [157-158]
In an action by the trustee in bankruptcy of a corporation to recover
    funds alleged to have been wrongfully withdrawn from the corpora-
    tion by its president and sole stockholder, the trial judge was to consid-
    er on remand whether to allow the defendant's counterclaim for funds
    he alleged to have advanced directly and indirectly to the corporation,
    in light of whether equitable considerations required treatment of the
    advances as a capital contribution.  [158-160]
On appeal of an action by the trustee in bankruptcy of a corporation to
    recover funds alleged to have been wrongfully withdrawn from the
    corporation by its president and sole stockholder, this court remanded
    the case for amplification of the trial judge's findings and greater spec-
    ification of the evidential basis of his decision, where the findings, as
    made, did not show the basis for the judge's conclusions that certain
    advances had not been paid by the defendant or had been repaid by
    the corporation, and that the corporation had been capitalized inade-
    quately; did not specify the actions constituting inequitable conduct of
    the defendant which the judge may have found; and did not establish
    the extent to which certain alleged payments by the corporation were
    actually made or, if made, could be regarded as proper corporate ex-
    penditures.  [160-163]

CIVIL ACTION commenced in the Superior Court on April
27, 1977.

The case was heard by *Steadman, J.*

*William F. Coyne, Jr.,* for the defendant.

*Manuel Katz* for the plaintiff.

CUTTER, J.  Mr. Friedman, as trustee in bankruptcy of Hyannis Marina, Inc. (Marina, Inc.), by his complaint filed April 27, 1977, seeks to recover from Kurker, president, treasurer, a director, and sole stockholder of Marina, Inc. (a) amounts spent from assets of Marina, Inc. for expenditures for noncorporate purposes alleged to be of benefit to Kurker, and (b) certain money allegedly withdrawn from Marina, Inc. (without consideration paid for the withdrawals).  Kurker in his answer denied any improper use of the assets of Marina, Inc. for his benefit and asserted that Marina, Inc. owed him amounts in excess of what the trustee contends Kurker owes to the estate of Marina, Inc.[1]

## The Trial Judge's Findings of Fact

After trial before a Superior Court judge, sitting without a jury, the judge filed a memorandum of decision on March 5, 1980.  This was amended on March 28, 1980.  In this amended decision, the judge found the facts (among others) set out in the following eight paragraphs:

(A) In 1973 Kurker agreed to buy from Gerald Kappitt and his wife three acres of land in Barnstable and Yarmouth with buildings and personal property used for (or in connection with) a marina.  The purchase price was $675,000 plus a brokerage fee of $25,000.

(B)  Kurker formed (1) Marina, Inc. and (2) a Massachusetts limited partnership, Hyannis Marina Service, Ltd.

---

[1] On August 22, 1979, one judge of the Superior Court enlarged the time within which Kurker could file a counterclaim.  Another Superior Court judge (the trial judge) on December 20, 1979, the opening day of trial, refused to allow Kurker to file this counterclaim, which asserted loans by Kurker to Marina, Inc. of sums of $47,000 and $100,000 in August, 1973, and a total of $171,000 in 1974 and 1975.  The trial judge seems to have taken this action, in part because the subject matter was within the jurisdiction of the Bankruptcy Court, in part "because similar matters . . . [are] covered" in Kurker's answer, and in part "because of the [lack of] timeliness of the filing of the counterclaim."

(Service, Ltd.). Kurker became one general partner of Service, Ltd. and caused Marina, Inc. to become the other general partner.

(C) Kurker proposed to sell units[2] of Service, Ltd. and to have Service, Ltd. acquire the marina real estate and then lease out various departments in the complex. Because the real estate sale would not be completed in time for the 1973 boat season, Kurker had the entire marina operation for that year conducted by Marina, Inc.

(D) The real estate was transferred by Kappitt to Service, Ltd. for a total amount of $700,000 paid by Service, Ltd. as follows:

| | |
|---|---:|
| (1) Service, Ltd.'s assumption of first mortgage | $343,241.90 |
| (2) Its note (secured by a second mortgage) | 228,375.60 |
| (3) Cash | 103,382.50 |
| (4) Its note for the broker's commission | 25,000.00 |
| | $700,000.00 |

The personal property (1) was transferred by Kappitt to Landmark Corporation (Landmark) of which Kurker was president, treasurer, a director, and sole stockholder, and was carried on Landmark's books at $147,261.54; and (2) then was transferred by Landmark to Marina, Inc. for that amount. Landmark's books showed $675,000 as the total consideration for the real estate and personal property and showed a $560,000 deferred gain on the transaction with Kappitt.[3] Marina, Inc. showed a debt to Landmark of $147,261.54 for the personal property.

---

[2] At a price of $3,200 for a general partnership unit and $6,400 for a limited partnership unit.

[3] Testimony by Kurker suggests, despite the fact that the real estate was transferred by Kappitt directly to Service, Ltd., that Kurker regarded the situation as involving the following steps: (a) All the property (real and personal) bought from Kappitt for the aggregate sum of $700,000 includ-

(E) Kurker's direct investment in Marina, Inc. was $2,000. There was no written lease between Service, Ltd. and Marina, Inc. Service, Ltd. (and also Landmark) had no income or source of income other than sums received from Marina, Inc.[4]

(F) Between August 3, 1973, when Marina, Inc. started business, and October 6, 1975, when Marina, Inc. filed a petition under Chapter XI of the Bankruptcy Act, Kurker, Landmark, and Kirk Realty Trust (of which Kurker was trustee) advanced in behalf of Marina, Inc. a total of $115,243.54 "which had been repaid by withdrawals" by Kurker, prior to October 6, 1975. Kurker, Service, Ltd. and Kirk Realty Trust were not listed as creditors of Marina, Inc. in its Chapter XI schedule. Landmark was listed as a noncontingent, liquidated, undisputed creditor on a 1974 note payable for $147,265.54.

(G) Kurker controlled the affairs and actions of Service, Ltd., Marina, Inc. and Landmark.

(H) Marina, Inc. was adjudicated a bankrupt on April 2, 1976.

---

ing broker's commission and inventory, he apparently thought of as having been transferred to Landmark; (b) Landmark transferred the inventory to Marina, Inc. for a note for $147,261.54, but no deed from Landmark to Service, Ltd. covering the real estate was produced or could be found; (c) Landmark set up a deferred gain on its books of $560,000 on the transaction, apparently (on the basis of an appraisal) by treating the acquisition of the real estate by Service, Ltd. from Kappitt as having been made by that partnership for Landmark. This may explain the somewhat perplexing theory behind statements, in the offering brochure for units of the partnership, that the marina assets were bought for $1,220,000.

[4] The judge also found that, from the beginning, Marina, Inc. had not paid salaries because of insufficient funds to operate. It owed, as early as October 7, 1974, Federal withholding taxes of $42,759.80 for which liens had been recorded. It lost in its seven-month fiscal year (F.Y.) ended February 28, 1974, $64,009.59 and in the twelve months ended February 28, 1975, $32,152.06.

## The Trial Judge's Rulings or Conclusions

The trial judge ruled that the payments (in the total amount of $72,963.57) listed in the margin[5] from the corporate assets of Marina, Inc. were not payments of a corporate liability but were made for Kurker's benefit. This ruling later was incorporated in a judgment for Mr. Friedman of $72,963.57 from which Kurker has appealed. Kurker also has appealed from the disallowance of his counterclaim (see note 1, *supra*).

The trial judge also made rulings as follows:

(I) Kurker "did not fulfill his fiduciary responsibilities" as an officer, director, and sole stockholder of Marina, Inc. "to protect the assets of" that corporation for creditors, and he did not "act in good faith in his dealings between" Marina, Inc. and himself in other "corporate, partnership, trust, and individual capacities."

(II) Kurker used Marina, Inc. "for his own purposes and financial gain" and "did not properly capitalize" it, so that the corporation never had sufficient assets to meet its debts.

---

[5] (a) Interest on second mortgage to Kappitt

|  |  |  |
|---|---|---|
| F.Y. ended 2/28/74 | $ 6,851.40 | |
| F.Y. ended 2/28/75 | 13,702.80 | |
|  |  | $20,554.20 |

(b) Payments to one Clifton Hall, who had lent funds to Kurker

|  |  |  |
|---|---|---|
| F.Y. ended 2/28/74 | $ 3,851.46 | |
| F.Y. ended 2/28/75 | 6,500.00 | |
|  |  | 10,351.46 |

(c) Payments for the benefit of Service, Ltd.'s real estate

|  |  |
|---|---|
| F.Y. ended 2/28/75 | 35,638.00 |

(d) Interest paid to Landmark for the 12 months ended 3/31/75

|  |  |
|---|---|
|  | 6,419.91 |
|  | $72,963.57 |

The judge also ruled that certain expenditures ($43,697.86) made by Marina, Inc., for repairs and other expenses concerning a chartered yacht and a purchased boat, were proper corporate expenditures.

(III) Any funds contributed by Kurker to Marina, Inc., "either directly or indirectly, were not loans" and Kurker "is not entitled to any credits or set-off with reference to such funds."

Following the amended memorandum of decision of March 28, 1980, Kurker filed a motion for a new trial "to take additional testimony on the question of the lease between" Service, Ltd. and Marina, Inc. on the fair rental value of the marina, and on Kurker's "breach of his fiduciary duty to" Marina, Inc. He also sought amendment of the findings concerning the lease and amendment of certain of the findings and rulings giving rise to the several aspects of liability included in the judgment. In particular, he sought either (a) to have struck from the decision the finding that advances of $115,243.54 by Kurker, Landmark, and Kirk Realty Trust had been repaid to Kurker prior to bankruptcy, or (b) to have the judge make specific findings concerning the transactions by which such repayment was accomplished. The motion for new trial and the motion for amendment of the decision were denied.

\*    \*    \*    \*

1. At the outset, Kurker contends that the trial judge did not have before him the books of Marina, Inc. for use as evidence for all purposes. At the opening of the case, counsel for Mr. Friedman first offered a stipulation of certain facts. Counsel for Kurker pointed out that in some instances in the stipulation they had "agreed . . . what the records show and there may or may not be a dispute as to some of the underlying . . . ." The judge asked counsel for Mr. Friedman whether that was his understanding. Counsel replied that the "plaintiff . . . isn't vouching for the records . . . . I would think that the defendant may be stuck with those records, but that is a different problem." The judge then asked whether what had been said was a "stipulation, that indeed . . . [the stipulation] is on the record, but neither party is vouching for it . . . ." The stipulation then was marked as an exhibit.

Mr. Friedman's counsel then offered in evidence (before any witness had been sworn) two general ledgers of Marina, Inc. (including some journal entries and adjusting entries at the close of two fiscal years ended in 1974 and 1975). Counsel for Kurker remarked that he assumed that these were not being offered "for the truth of everything . . . contained therein," but went on to say, "I have no objection, they being the business records of the corporation . . . ." The judge inquired whether these ledgers were being offered "merely as the records" of Marina, Inc. and was answered in the affirmative. Kurker's counsel then said, "I have no problem with the[ir] being the records of the company." The judge then directed that counsel call to his attention any matter in the records which they wished to have him consider.

There was some further testimony that the records may have been inaccurate in some respects. This, however, did not affect the status of these records as having been admitted (without objection to their being business records) and thus constituting evidence in the case for all purposes. The trial judge correctly so ruled, in denying the motion by Kurker for involuntary dismissal of the complaint. See as to necessity of timely objection, *Freyermuth* v. *Lutfy*, 376 Mass. 612, 616-617 (1978). See, as to business records, cases collected in Liacos, Massachusetts Evidence 328-331 (5th ed. 1981). See also discussion in *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 406-407, and Liacos, J., concurring, at 408-410 (1982). See as to corporate records to which corporate officers and shareholders have access, *Katz* v. *United States*, 321 F.2d 7, 10-11 (1st Cir.), cert. denied, 375 U.S. 903 (1963).

2. The trial judge's decision, disallowing any set-off of Kurker's direct advances to Marina, Inc. (and his indirect advances to Marina, Inc. through Service, Ltd., Landmark, and Kirk Realty Trust) against Mr. Friedman's claim, appears to rest on his interpretation of *Pepper* v. *Litton*, 308 U.S. 295, 304-312 (1939). That case indicates (at 308) that a Bankruptcy Court, in passing upon the bankruptcy claims

of directors, officers, and controlling stockholders, has broad equitable power "to sift the circumstances . . . [of] any claim to see that injustice or unfairness is not done . . . ." This, said the court (at 309-310), extends to subordination of "so-called loans or advances by the . . . controlling stockholder . . . to claims of other creditors" thus treating such advances "in effect as capital contributions" in a number of situations. These, the opinion indicates (at 310), include that arising "where the paid-in capital is purely nominal" and the stockholder claims that "the capital necessary for the scope and magnitude of the operations of the company" has been "furnished . . . as a loan." Here the court cited *Albert Richards Co.* v. *Mayfair, Inc.*, 287 Mass. 280 (1934); see especially discussion at 288 et seq.[6] Compare *Brown* v. *Freedman*, 125 F.2d 151, 156 (1st Cir. 1942), where advances not claimed as loans were treated as sufficient to prevent a bankrupt's capitalization from being treated as purely "nominal"; *Arnold* v. *Philips*, 117 F.2d 497, 501-503 (5th Cir.), cert. denied, 313 U.S. 583 (1941), where original capital, enlarged by advances for improvements, could be found to negate undercapitalization. Compare also *Earle* v. *W.J. Jones & Son*, 200 F.2d 846, 850-851 (9th Cir. 1952, a tax case).

In any event, more recent cases seem to recognize that undercapitalization alone, unaccompanied by inequitable conduct, will not provide a basis for subordination of claims for advances to a corporation which later becomes bankrupt. See *In re Mid-town Produce Terminal, Inc.*, 599 F.2d 389, 392-394 (10th Cir. 1979); *Matter of Multiponics, Inc.*, 622 F.2d 709, 712-722, but see 723-725 (5th Cir. 1980). Compare *Matter of Mobile Steel Co.*, 563 F.2d 692, 698-706 (5th Cir. 1977). Whether an advance should be treated as a capital contribution to, rather than creating a debt of, the bankrupt depends to some extent on the objective intention

---

[6] *Pepper* v. *Litton* may have been limited somewhat by *Comstock* v. *Group of Institutional Investors*, 335 U.S. 211, 228-231 (1948), as the dissenting Justices in that decision apparently thought to be the case.

of the contributor, and in part on whether, in particular circumstances, equitable considerations require treatment of the advance as a capital contribution.  See *In re Mid-Town Produce Terminal, Inc., supra* at 393-394; Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand. L. Rev. 83, 94 et seq. (1961).  The authorities cited above suggest criteria which may guide a decision. See the similar considerations in tax cases, e.g., *Wood Preserving Corp. of Baltimore, Inc.* v. *United States*, 233 F. Supp. 600, 605-606 (D. Md. 1964), aff'd, 347 F.2d 117, 118-119 (4th Cir. 1965).

3.  Kurker contends, as he did on his motion for a new trial, that the judge's subsidiary findings are not adequate to support conclusions made in some of those findings or in his "rulings" (which, perhaps, more properly in some instances might have been called "ultimate findings").  Kurker takes the position that, under Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), findings should make apparent the basis for them. *Schrottman* v. *Barnicle*, 386 Mass. 627, 638-640 (1982). *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 414-418 (1980).[7]

Among the findings which, so Kurker claims, fail to show the basis (in evidence or adequate subsidiary findings) of the trial judge's action are those listed below.

(a)  Kurker contends that the trial judge inadequately discloses the basis for his finding, (F) above, that Kurker and organizations close to him (prior to the filing of the Chapter XI petition on October 6, 1975) advanced $115,243.54, "which had been repaid."  He argues that the amount of such advances prior to October 6, 1975, was miscomputed by the judge, perhaps on the basis of specified exhibits, and

---

[7] See *Hudson* v. *Oliveira*, 10 Mass. App. Ct. 868, 870 (1980); *Patrician Tower Owners, Inc.* v. *Fairchild*, 513 F.2d 216, 219-222 (4th Cir. 1975); Smith & Zobel, Rules Practice §§ 52.4, 52.7 (1977 & Supp. 1981).  See also *Roberts* v. *Ross*, 344 F.2d 747, 751-753 (3d Cir. 1965); *O'Neill* v. *United States*, 411 F.2d 139, 146 (3d Cir. 1969), *S.C.*, 450 F.2d 1012, 1014-1015 (1971); *O'Neal* v. *Gresham*, 519 F.2d 803, 805-806 (4th Cir. 1975).

that, in any event, there were other advances, either not included in the specified exhibits or not reflected in Kurker's "loan account" on the books of Marina, Inc. The judge's finding, (F) above, does not indicate in adequate detail (1) what his basis in the evidence was for failing to find that certain advances were made by or for Kurker, or (2) how Marina, Inc. (obviously greatly pressed financially in 1974 and 1975) could have repaid in this period as large a sum as $115,243.54.

One basis of the trial judge's ultimate conclusion that Kurker's direct and indirect advances to Marina, Inc. were not loans but capital contributions seems to have been that Kurker "did not properly capitalize" Marina, Inc. The cases already cited show that, in some circumstances at least, whether a single shareholder corporation is adequately capitalized (or has only nominal capitalization) will be affected by the amount (and circumstances) of advances to the corporation made by or for the shareholder. Kurker contends that the $2,000 paid in by him for the shares of Marina, Inc. was not the only capital contribution by him. He suggests that $147,261.54 (including about $135,436.54 paid for inventory[8]) in effect was similar to such a capital contribution, although it is represented in part by a note of Marina, Inc. to Landmark for $135,436.54 due in 1985, which (with additional amounts) has been subordinated to the claims of general creditors of Marina, Inc. Other advances are shown in the Kurker loan account, which under the cases may have to be treated as capital contributions. To determine whether Marina, Inc. was capitalized adequately, the findings should indicate the judge's treatment of all

[8] There is, however, no finding by the trial judge that the inventory had a fair market value of $135,436.54 when transferred to Marina, Inc. or what its fair value then was. The evidence would permit a finding (see note 3, *supra*) that Landmark did not pay any separate amount for the inventory beyond the $700,000 (including commission) paid by Service, Ltd. to Kappitt for the real estate, as found by the judge. See finding (D), *supra*. The amounts set out on Landmark's books appear to be allocations of the amount shown by an appraisal of the property bought from Kappitt made at some time before Kappitt gave his deed.

advances by Kurker or by his controlled entities, their fair value, and whether and by what payments they had been returned to Kurker directly or indirectly.

It may be that the trial judge considered that the absence of any indication of indebtedness of Marina, Inc. to Kurker or Service, Ltd. or to Landmark (apart from the subordinated liability of $147,261.54), in the schedules filed during the Chapter XI proceedings, showed that no indebtedness then existed to any of them. Compare *Matter of Calpa Prods. Co.*, 249 F.Supp. 71, 72 (E.D. Pa.), aff'd, 354 F.2d 1002 (3d Cir. 1965), cert. denied sub nom. *Grasberger* v. *Calissi*, 383 U.S. 947 (1966). He may have intended his ruling, (III) above, that funds contributed by Kurker to Marina, Inc. "were not loans," to indicate that all advances to Marina, Inc. by Kurker, directly or through others, were made with the objective intention that they should be capital contributions to an undercapitalized corporation.

The judge well could have felt that the liability of Marina, Inc. to Landmark for the inventory and another advance, amounting in all to $147,261.54, showed that it was not a capital contribution (although, because subordinated to claims of general creditors, it had somewhat similar effect). His general rulings, see (I) and (II) as to Kurker's use of Marina, Inc. for his own gain, Kurker's lack of "good faith" in dealing with Marina, Inc., and his failure to protect its assets, may have been intended in part as findings of inequitable conduct by Kurker providing basis (see, e.g., *Matter of Multiponics, Inc.*, 622 F.2d at 721) for subordination of his direct and indirect advances to the claims of the general creditors of Marina, Inc. The judge failed, however, to specify the actions constituting such misconduct and to state the effect he felt it had upon the adequacy of the capitalization of Marina, Inc.

The matters just discussed have direct bearing upon the propriety of the set-offs disallowed by the trial judge. We think that more complete subsidiary findings, and greater specification of the evidential basis of his decision, are essential to our review. The case must be remanded for amplification of the decision.

4. Kurker contends that, even if set-off of his own claims against Marina, Inc. is not permitted, certain of the claims against him allowed by the trial judge should be eliminated or reduced.

(a) Kurker contends that there is no adequate showing that Marina, Inc. paid interest to Landmark in the sum of $6,419.91 during the twelve months ended March 31, 1975. See note 5, subparagraph (d), *supra*.

(b) Kurker may suggest somewhat obscurely that payments made to Kappitt on the second mortgage during the fiscal years ended in 1974 and 1975 should be regarded as rent or in lieu of rent. Marina, Inc. as one of the general partners of Service, Ltd. was indirectly liable for half of this mortgage interest. The balance of it may have been proper as a corporate expense for use and occupation. The judge should make findings concerning the fair rental value of Service, Ltd.'s real estate used by Marina, Inc. and consider to what extent, if at all, each payment included in the judgment against Kurker reasonably may be regarded as a proper payment by Marina, Inc. for rent or use and occupation.

(c) Further amplification of his findings may lead the judge to conclude, in his discretion, that the hearings should be reopened to permit further evidence concerning whether there was in fact a lease from Service, Ltd. to Marina, Inc. and what its terms were. It also may be appropriate for the judge to reconsider whether, in the light of authorities cited in this opinion, he should permit Kurker to file his counterclaim amended to the extent necessary to allow any recovery or set-off required by expanded findings.

5. The judgment is reversed to permit amplification of the trial judge's findings and rulings in a manner consistent with this opinion, and for such further hearings and proceedings, if any, as the judge may consider to be appropriate.

*So ordered.*