Billings, A.J.
This is a suit on a note. It is complicated, if at all, by the fact that the noteholder is a corporation controlled by one George Burnell, who was, at the time the note was executed, the President, CEO, and a director of the defendant. The defendant argues (a) that the Note was merged into a láter-signed Employment Agreement between it and Burnell, and (b) that the plaintiffs claim on the note should be equitably subordinated to the claims of defendant’s other, non-insider creditors.
For the reasons that follow, the plaintiffs motion for summary judgment is ALLOWED.
STATEMENT OF FACTS
The following facts of record are either undisputed, or viewed in the light most favorable to the defendant. The defendant Cambridge Automatic, Inc. (“Cambridge”) manufactures and sells pin insertion equipment, used in the manufacture of computer circuit boards. George Burnell (“Burnell”) had been a director of and consultant to Cambridge for slightly over two years when, in January 2000, he became its President and CEO. He remained in this position until September 12, 2001, when he resigned. He has never been a stockholder of Cambridge, although his employment agreement (see below) included provision for stock options to be granted at the end of calendar 2000, 2001, and 2002. Burnell had left the company before the end of 2000, and so never earned any options. Burnell has made several offers to purchase all or some of Cambridge’s stock, but they came to naught.
Burnell is also the President and Clerk of plaintiff SFB Corporation. His wife is presently SFB’s sole employee. SFB, which Burnell’s attorney described in *305 correspondence to Cambridge’s counsel as “merely a paper corporation [which] has not done ‘business’ since 1996, with exceptions noted,” had not, as of April 22, 2002, filed annual reports for the years 1997, 1998, 2000, and 2002. This may have meant that it could not claim to be in good standing at that time, see G.L.c. 156B, §116. There is no evidence, however, that SFB has been dissolved, or is otherwise barred from prosecuting this action. The parties were able to, and did, procure and submit competing certificates from the Secretary of the Commonwealth, SFB’s reporting that it was in good standing as of May 17, 2001; Cambridge’s reporting that as of July 10, 2002, SFB was delinquent in filing the four reports above mentioned.
The circumstances surrounding the execution of the promissory note were as follows. In the spring of 2000, Cambridge was acutely short of cash and in default with its bank. Three or its directors — Frederick Wardwell, Sr., Frederick Wardwell, Jr., and Burnell— each agreed to loan the company $35,000. The record does not disclose whence Burnell’s loan proceeds came, whether on a personal account, an SFB account, or elsewhere. There is no dispute that the loan was made and the funds paid to Cambridge, or that the obligee on the note is SFB.
The Wardwells, Junior and Senior, received promissory notes similar in form, in most respects,[1] to SFB’s. All three notes are in the principal amount of $35,000, “plus interest at the rate charged by the bank for Cambridge’s line of credit." All recite that they “shall be governed by and interpreted in accordance with the laws of the Commonwealth of Massachusetts.” The Wardwells’ notes are dated March 9 and 16, 2000, respectively; SFB’s, April 4, 2000. Wardwell, Jr. recites by affidavit, “We all understood that we would not be paid unless and until Cambridge was able to pay the trade and bank debt.” All three notes, however, are expressly “due and payable on demand.”
On August 30, 2000 the parties signed an Employment Agreement pertaining to Burnell.[2] The agreement recites that it is “made effective as of the 7 day of January 2000." It covers standard subject matter: duties, compensation (including stock options), and benefits of the employee; termination: confidentiality, noncompetition, nonsolicitation, and inventions; and so forth. Paragraph 10.4 states, in pertinent part;
This Agreement represents the exclusive statement of the entire agreement between the. parties concerning the subject matter hereof and supersedes all prior written agreements, but not including any stock purchase or stock option agreement between Company and Employee.
As noted above, Burnell resigned on September 12, 2000. SFB made demand on the note on September 21, 2001.
DISCUSSION
SFB has made out a prima facie case on the note. See Community National Bank v. Dawes, 369 Mass. 550, 558 (1976); G.L.c. 106, §3-307.1 turn, therefore, to the defenses asserted by Cambridge.
A. Integration Clause in Employment Agreement
Cambridge’s first argument — that paragraph 10.4 of the Employment Agreement bars recovery on the note — is thrice flawed.
First, the Employment Agreement, although not signed until later, begins with the statement that it is “made effective as of the 7 day of January 2000.” The contract is unambiguous on this point, compare Suffolk Construction Co. v. Lanco Scaffolding Co., 47 Mass.App.Ct. 726 (1999), and Cambridge suggests no reason why the parties’ choice of effective date should not be given effect. To call the April 4, 2000 promissory note a “prior written agreement[]” subject to paragraph 10.4 is to read the very first sentence out of the Employment Agreement.
Second, paragraph 10.4 of the Employment Agreement states that the agreement “represents the exclusive statement of the entire agreement between the parties concerning the subject matter hereof." (Emphasis supplied.) The Employment Agreement relates to the traditional subject matter of employment agreements — duties, compensation, benefits, and post-employment restraints. The promissory note, on the other hand, evidences a loan by SFB and the resulting obligation of Cambridge, and deals with such matters as interest and terms of repayment. It covered different subject matter from that of the Employment Agreement, and thus fell outside the latter’s paragraph 10.4. Nothing in the language of the Employment Agreement or, for that matter, the surrounding circumstances suggests that the parties thought the subject matter of the two transactions was the same or even related, or that in regularizing Burnell’s employment, they intended to extinguish the obligation to SFB.
Third, paragraph 10.4 only integrates prior agreements “between the parties.” SFB is not a party to, and in fact is nowhere mentioned in, the Employment Agreement. Apart from quoting counsel’s unguarded reference to SFB as a “paper corporation,” Cambridge has done little to undertake the showing that would be required to ignore the corporate form. See, e.g., My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619-20 (1968). More to the point, “[t]he doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice.” Attorney General v. M.C.K., Inc., 432 Mass. 546, 555 (2000). It is not a rule of contract construction, and it has no bearing on what the parties intended by paragraph 10.4.
*306 B. Equitable Subordination
Cambridge next urges that the note should be subordinated to Cambridge’s bank and trade debt, by treating it as a contribution of capital. As a matter of Massachusetts law,
“Whether an advance should be treated as a capital contribution to, rather than creating a debt of, the [corporation] depends to some extent on the objective intention of the contributor, and in part on whether, in particular circumstances, equitable considerations require treatment of the advance as a capital contribution.” Where a corporation is formed with initial capital that is grossly inadequate to the purposes of the corporation’s business, requiring immediate shareholder loans in order to operate, shareholders’ so-called debt should be treated as equity capital, and given no preference over creditors in the distribution of assets.
Yankee Microwave, Inc. v. Petricca Communications Systems, Inc., 53 Mass.App.Ct. 497, 522 (2002), quoting Friedman v. Kurker, 14 Mass.App.Ct. 152, 159-60 (1982). The bankruptcy courts have further developed the concept of equitable subordination, identifying as many as thirteen factors bearing on the issue as it applies in bankruptcy.[3]
Neither line of cases is of much assistance to Cambridge, however. Cambridge is not in bankruptcy, and unless and until this changes, it need not suffer the burdens and may not claim the benefits of bankruptcy law and practice.
Turning, then, to state law, Cambridge’s showing does not approach what would be required to treat SFB’s loan as an advance of capital. First, there is the obvious point that neither SFB nor Burnell was, or ever became, a stockholder of Cambridge. Neither stood to realize any appreciation in their ownership interest in Cambridge, because there was no such interest — a fact with obvious relevance to the question of “the objective intention of the contributor.”[4]
Next, the SFB loan was not part of Cambridge’s initial capitalization (Cambridge having been incorporated thirteen years before), and Cambridge has made no showing that it was ever undercapitalized, only that it was having cash flow problems.
Finally, there are no “particular circumstances” in this case requiring that the SFB/Burnell loan be regarded as something it was not, i.e. a contribution of capital. To be sure Burnell, although not a stockholder, was an insider, which makes SFB an insider of an insider. However,
[t]hese maybe creditors and even secured creditors of the corporation, with every right that a stranger might have; except in so far as in exceptional cases courts find it necessary to restrict their rights in order to prevent fraud or injustice through the use of corporate forms.
Hanson v. Bradley, 298 Mass. 371, 379-80 (1937). SFB advanced real money; the consideration was a demand note; no fraud is even hinted at; and there will be no injustice to other creditors or to Cambridge if it is repaid.
ORDER
For the foregoing reason, plaintiff s Motion for Summary Judgment is ALLOWED. Neither party having introduced evidence of the applicable interest rate(s), interest is to be computed at the statutory rate of 12% from September 21, 2001.

The one difference is that SFB’s note, unlike the Wardwells’ notes, purports to be secured by a “second lien” on Cambridge’s assets, subordinate to the bank’s. There is no allegation, however, and no evidence, that the lien was ever perfected.

This, at least, seems to be the date that Wardwell, Jr. signed the agreement for Cambridge; whether Burnell signed it on the same day or not is not clear. Wardwell’s affidavit states that the agreement was signed “after extensive negotiation.”

These are; “(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) ‘thin’ or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement.” In re Blevins Concession Supply Co., 213 B.R. 185, 187-88 (Bktcy.S.D.Fla. 1997), and cases cited.

The only other “evidence” offered on this point is Wardwell, Jr.’s statement — purportedly on his own, his father’s, and Burnell’s behalf — that “(w]e all understood that we would not be paid unless and until Cambridge was able to pay the trade and bank debt.” Needless to say, this testimony falls well short of meeting the requirements of Mass.R.Civ.P. 56(e), first sentence.