Nickerson, Gary A., J.
This is an action for declaratory relief wherein the parties seek a determination as to who owns shares of stock in Cape Cod Coolers, Inc., as to each shareholder’s respective percentage of ownership interest in the corporation and as to the correct distribution of corporate assets. The action was tried, jury waived, over the course of twelve days from April 3rd to the 26th, 2006. Based on all the credible evidence the court enters the following findings of fact.

*699
FINDINGS OF FACT

After the plaintiff William R. Buchanan moved to Chatham, Massachusetts in the mid-1970s, he quickly established himself as a respected building contractor. An energetic man by nature, he did not take the real estate slump of the late 1980s passively but instead saw it as an opportunity to branch out into a new business venture. Starting in 1988 he researched the rapidly growing business of bottled water, seeing a marketing niche for the sale of bottled water to retail consumers under a local brand name.
In the course of his construction work and real estate development Buchanan undertook some projects as joint ventures with William C. Tappan, a local business man now deceased. Buchanan viewed Tappan as his mentor in real estate matters. Buchanan conducted his development work through two entities, Buchanan Construction and Cape Escape, Inc. The downturn in the construction trades of 1988-1990 coincided with stress in Buchanan’s personal life, specifically in his marriage.
During this period, Buchanan wound down his contracting business, placing his liquid assets first in Cape Escape and then in an entity called Seltzer Water Trust. Buchanan was receiving financial advice from Paul Osganian, a gentleman from Sudbury, Massachusetts who had some experience as an accountant and business manager, and his legal advice from John Ericson, a lawyer in Chatham. Buchanan’s finances became quite murky, between real estate ventures with Tappan, mortgages, at least on paper, with Osganian, and Seltzer Water Trust with Ericson as trustee. This lack of clarity was intentional, to screen Buchanan’s assets from his estranged wife. While probably unintended, this obfuscation had the secondary effect of making it difficult to accurately account for Buchanan’s contributions to the business venture now before the court.
Buchanan Beverages was the first name Buchanan gave to his new water business. Apparently Buchanan Beverages was never incorporated, existing as the business name of a sole proprietorship. Buchanan set to work to develop a product and, in the process, to incur hefty expenses. The initial funds for Buchanan Beverages may have come from Tappan, from Buchanan’s father or from Buchanan’s assets in Seltzer Water Trust.[1] Several of the documents that evidence the transfer of money from Seltzer Water to Buchanan Beverages reflect that the funds were loaned to the water business.
Early in the development of the water business, Buchanan reached out to John D. Warner. In his home building days Buchanan had worked in Chatham on Warner’s property. The two men formed a friendship. Warner was then a vigorous retiree with an extensive business background including the ownership of radio stations, a newspaper and an interest in a bank. Buchanan shared his vision of a local brand of bottled water with Warner, who quickly became Buchanan’s leading advisor in the venture. The two men attended trade shows together and met often to discuss potential products and marketing schemes.
Both men take credit for creating the brand name for the product, Nantucket Natural. The name Nantucket Natural eclipsed Buchanan Beverages. Buchanan began to refer to Nantucket Natural as both the product and the business entity. Again, he never incorporated Nantucket Natural. Nonetheless Tappan was held out to the public as the “CEO” of Nantucket Natural. While Buchanan has described Tappan’s new title as one assigned by Buchanan in gratitude for all Tappan did as a mentor, the court infers that, by naming Tappan as the chief officer of Nantucket Natural, Buchanan was deflecting attention away from himself thereby minimizing his exposure in the divorce proceedings. On the confused state of the evidence regarding funding one is also left to wonder whether Tappan’s title derived from his contribution of funds to Buchanan Beverages.
While Warner acted as Buchanan’s main sounding board and advisor, Osganian was brought into their discussions at times, as was John Martin, a marketing consultant brought in by Warner. Buchanan secured the services of a product development firm to test alternative formulas of fruit flavored waters, both carbonated and still. Warner joined Buchanan at the testing firm’s headquarters to sample potential products. With Buchanan in the lead, the venture was emerging in 1990 from concept to reality.
On July 30, 1990, Cape Cod Coolers, Inc. was incorporated. Ericson prepared the papers for filing with the Massachusetts Secretary of State. The Articles of Organization authorized 20,000 shares of common stock. Buchanan was listed as president, treasurer and as a director. Warner was named vice president and a director. Ericson was designated the clerk of the corporation. Ericson drafted a set of by-laws. A corporate records kit was purchased. With Cape Cod Coolers in place, Buchanan Beverages ceased to exist, however Nantucket Natural continued to be used as a name for the emerging business. All concerned, however, recognized the existence of the corporation as the entity doing business as Nantucket Natural.
July 30th, 1990 witnessed the formal beginning of Cape Cod Coolers as a corporation but it was also sadly the last day anyone tended to the corporation’s records in a meaningful way. No shareholder’s agreement was prepared. Stock certificates came with the kit but none were made out for Buchanan or Warner. No entries were made on the stock issuance/transfer ledger. In short, Ericson did the bare minimum to get Cape Cod Coolers established in the eyes of the Commonwealth, but nothing more, not out of neglect by Ericson but simply because the principals of the new *700 corporation had yet to settle the question of stock ownership.
Clearly paperwork was never Buchanan’s forte. He charged ahead doing what he did best, physically building something new. During 1990, Buchanan had a beverage bottler in Worcester produce a few thousand cases of four flavors of still water and one sparkling water. A sales staff was hired. Buchanan quarterbacked every aspect of the production and marketing effort. He was, at times, literally driving the length of Cape Cod with cases of bottled water in a quest to get retail shelf space. From this process he learned the hard reality that to succeed he needed a large distribution network.
These initial production and marketing activities were expensive, but a precise figure was not established at trial. The bookkeeping for Cape Cod Coolers was no better than the record keeping for Seltzer Water Trust or Buchanan Beverages. Nonetheless, the evidence is clear that all funds expended in the water business before 1991 came from Buchanan’s resources, primarily from Seltzer Water Trust. Presumably Warner paid for his own incidental out-of-pocket expenses incurred on behalf of the business. Prior to the spring of 1991 Buchanan, Warner, Ericson and Osganian had often discussed methods for financing the venture. Much of the work Warner did during that time was devoted to developing a business plan and investment contacts.
By the spring of 1991 Buchanan, Warner, Osganian and Ericson were hammering out the general parameters for soliciting investors. In broad brush terms there was to be a core group which would hold preferred stock and have control of the management of the company while additional investors would hold non-voting common stock. Despite Warner’s drafts of this plan and despite the testimony and notes of the various witnesses the plan was never finalized. No agreement was ever reached whereby investors would pony up $50,000 for a 1% interest in the company. No variation of that concept was ever accepted.
The absence of a shareholder agreement and a stock solicitation plan did not deter the core investors from turning money over to Buchanan. Warner paid $50,000 into the till in two installments, $20,000 during the first half of 1991 and $30,000 during the second half. Warner solicited his close friend, James F. Ward, to invest $50,000 in Cape Cod Coolers in January 1992. Warner and Ward were college roommates some fifty years ago and maintained a close friendship ever since. Ward ran a successful trucking company in New Jersey together with other diverse business interests. Warner also procured Dr. Trevor McGill as an investor for $50,000 in September 1992. This jurist specifically rejects Buchanan’s present claim that Warner, Ward and McGill each invested $50,000 on the premise that they would each receive a 1% interest in the company. Warner invested his funds as an active participant in the firm, believing he was in effect a partner with Buchanan. Ward and McGill invested on their blind faith in Warner.
Buchanan continued in 1991 to peddle Nantucket Natural to retailers through his own efforts and a variable sales team of college students. Late in the summer of 1991 Buchanan developed a contact in J.J. Taylor Company, a major distributor of beverages in Southern New England. Buchanan sought Warner’s advice on how to proceed. Negotiations were begun with J.J. Taylor to cany the Nantucket Natural line. Early in 1992 Buchanan was introduced to John Kayajan, the owner of the Coca Cola franchise on Cape Cod. Warner took an active role in wooing Kayajan. Everyone involved with Cape Cod Coolers strongly favored a deal with Kayajan as he owned both a bottling plant and a distribution network under the corporate name of Coca Cola Bottling Company of Cape Cod. Negotiation with J.J. Taylor ended.
By the spring of 1993, Kayajan and Cape Cod Coolers had an agreement that Nantucket Natural would begin production at the Coca Cola plant in Sandwich in May 1993. Things went badly from the outset. Production was delayed due to Coca Cola’s own production needs. Attempts to bottle the water during the summer of 1993 failed for technical reasons. The plant incurred the wrath of the local health agent in the fall of 1993 and was shut down for months. Throughout these attempts to get production going Buchanan was at the plant almost daily. Production involved retooling part of the plant’s processing equipment. Ward was active in obtaining appropriate equipment in New Jersey.
Before production resumed in 1994, Kayajan called the principals of Cape Cod Coolers to a meeting at his plant. He wanted their individual guarantees, in writing, to cover the costs of resumed production. Buchanan, Warner and Osganian attended. Only Buchanan signed the guarantee.
Production resumed in August 1994. The product had a bad taste. Tests showed bacterial contamination. The production was destroyed and so was Nantucket Natural. Cape Cod Coolers had exhausted its resources. The corporate till was empty. Neither Warner nor the other investors were willing to pour more money into the project. By September 1994, Cape Cod Coolers, Inc., was out of business.
Buchanan’s dream was no more. He became depressed and relocated to Florida where eventually he became involved in running a small restaurant. Warner was unwilling to walk away from the Coca Cola fiasco without a fight. He decided to sue in the name of Cape Cod Coolers, Inc. Buchanan did not want to pursue a lawsuit but he agreed Warner could do so. Buchanan did appear as a trial witness. Warner proceeded to shoulder the entire cost of the lawsuit. Suit was filed in this court in July 1995. After a jury trial, Cape Cod Coolers prevailed to the tune of *701 $2,520,000.00. Kayajan’s appeal was not successful. Cape Cod Coolers, Inc. v. Coca Cola Bottling Company of Cape Cod, 56 Mass.App.Ct. 1115 (2002). With interest there is over $3,700,000.00 being held in escrow pending the determination of this action. Despite Buchanan’s best efforts Cape Cod Coolers never turned a dime’s profit in its active business life but the corporate carcass proved to be a gold mine.
While any trier of fact in this case would be hobbled by the lack of accurate bookkeeping and the lack of an expressed shareholder agreement, the evidence is sufficient for this jurist to determine, by a preponderance of the evidence, the proper allocation of shares of stock and the allocation of funds on hand based on the conduct of the parties. In other words, there was an implied contract to allocate the shares of stock and an implied contract governing contributions of time and money to the corporation.
Buchanan devoted the bulk of his working hours to Nantucket Natural from 1989 through August 1994. Nantucket Natural was his dream, his vision and, perhaps, his obsession. Such is the essence of someone who is the founder of a new business. He contributed cash, primarily from Seltzer Water Trust, of at least $300,000.[2]
Buchanan did not draw a salary from Cape Cod Coolers but, from the very outset of Buchanan Beverages through August 1994, Buchanan did pay many of his personal expenses from the business checkbook. There are documents in evidence proving his habit of paying for his home and other mortgages from business funds, his charge bills, insurance bills, and so on. There are large draws against the corporate checkbook to cash. Buchanan’s testimony that these draws were for business vendors is not credible. The cash draws and payments of personal expenses were made in lieu of a salary. The evidence supports the conclusion that Buchanan paid himself approximately $100,000 over the life of the business. Compared to salaries in other start up ventures, Buchanan’s draw was modest. The size of the draw is not troubling to this jurist but the veiled manner of payment is a concern. The manner of payment shows Buchanan was less than forthright with his fellow investors.
Buchanan’s $300,000 cash contribution cannot be characterized as a contribution to capital. Early in the venture, Buchanan established a pattern, according to the documents available, of transferring money from Seltzer Water Trust to the business as loans. Several of his latter cash transfers do not bear notations as either loans or contributions to capital. There are no documents suggesting that a specific cash transfer was a contribution to capital. Buchanan was well aware of the risky nature of his new business. He had Osganian and Ericson advising him as to how to proceed: It was in his best interest at the outset to loan money to the new venture and thereby have first call on being paid back. Unlike the other investors, Buchanan’s contribution to capital was his vision, his position as founder. Buchanan intended his cash transfers to be loans and his prodigious work to be compensated in part by his draws in lieu of salary and in part to be considered as his contribution to capital.
Warner likewise did not draw a salary from the corporation. Unlike Buchanan, he did not need a draw in lieu of salary as he had significant other financial resources. The gentleman did not expect to be reimbursed for his labor in shepherding the business along. Warner’s initial cash transfers to Cape Cod Coolers, totaling $50,000, were intended to be contributions to capital. All involved recognized that Warner’s intent was to invest in the corporation. The $50,000 was not a loan. During the active life of the business Warner made out of pocket expenditures for business expenses but failed to document these expenditures. His present claim to be credited for such expenditures fails for lack of proof just as Buchanan’s claim for expenditures in excess of $300,000 fails.
After August 1994, Warner pursued the litigation against Kayajan with determination. The gentleman bankrolled the case single-handedly to the tune of $56,000. To date, Warner has not been reimbursed for this expense. There is no contemporaneous evidence suggesting the nature of this cash transfer, however Cape Cod Coolers had ceased doing business after August 1994. Logic alone suggests Warner’s $56,000 was not an investment in an active corporation, i.e. it was not a contribution to capital. The $56,000 is best treated as a loan to the corporation and as such is consistent with the pattern of loans first established by Buchanan.
Ward’s cash transfer of $50,000 to Cape Cod Coolers was expressly made as a contribution to capital. From time to time Ward assisted in the business by procuring equipment to benefit the Coca Cola plant and by seeking an alternate bottler in Puerto Rico, but his efforts were minor and wholly consistent with the actions of someone out to guard his investment. The same can be said for his assistance in preparing the case against Kayajan. He did not expect to be reimbursed in the form of salary for his efforts. Likewise he did not regard his cash contribution as a loan to Cape Cod Coolers. Ward did expect to recover money as a shareholder.
McGill’s payment of $50,000 to Cape Cod Coolers was also an investment, a contribution to capital. McGill was strictly an investor, taking no active role in the operation of the business or in the suit against Kayajan.
From all the credible evidence this jurist implies that Buchanan, Warner, Ward and McGill agreed that they were equal shareholders. Surely this can be inferred from their conduct. The most direct statement of their equal standing came from Ericson in the course of his deposition in 1996 in the Kayajan law *702 suit (Ex. 69).[3] Ericson then testified that the four men each held 200 shares of stock.
The figure of 200 shares of stock recurs throughout the evidence. In March 1993 Buchanan and Ericson signed an Internal Revenue Service form 2553, a so-called S Corporation election, listing Buchanan as the owner of 200 shares of stock in Cape Cod Coolers, Inc.[4] In April 1992 Ericson wrote to Ward to welcome him aboard as a stockholder and director of Cape Cod Coolers. In the letter he promised to forward a stock certificate “in the near future," but the promise was not fulfilled until 1996. At tax time in 1996, Ward sought evidence of his investment in Cape Cod Coolers so as to justify his taking a loss on his income tax return. So goaded, Ericson issued to Ward a stock certificate for 200 shares (Ex. 50A, 50B). When Cape Cod Coolers granted shares to the Cape Cod Community College in September 1992, the college was issued a stock certificate for 200 shares (Ex. 49).
Ward was issued stock certificate number 5. The college was issued stock certificate number 4. At trial no one could account for certificates 1,2, and 3. McGill ponyed up his $50,000 a day or two before the college’s certificate was issued. Neither Buchanan nor Ericson left with this jurist the impression that their testimony was entirely credible. Ericson’s claim of ignorance as to what became of certificates 1, 2 and 3 rings hollow. This jurist infers that one certificate was for Buchanan, one for Warner and one for McGill, all for 200 shares each and all destroyed by either Ericson or Buchanan.
The 200 shares issued to the college is, at first glance, a bit of a puzzle or, as Buchanan would have us believe, strong evidence that Warner and company are each entitled to only a one percent interest. Correspondence in 1992 between Warner and his friend, Grace Grossman, who was then the chairman of the college’s trustees, firmly puts the College’s interest at one percent (Ex. 8). The stock certificate (Ex. 49) issued to Grossman as trustee for the college references “a Stockholders Agreement dated 9/24/92,” but no such agreement was ever entered into evidence. Moreover, the certificate on its face bears the typed-in direction to “See reverse side of this certificate for restrictions,” but alas Exhibit 49 is a photocopy of the original certificate sans the reverse side. By stipulation the parties to this action have agreed that the college shall receive a one percent interest in the equity of Cape Cod Coolers, Inc. The intent of Warner and Buchanan was to grant the college a one percent interest as part of Cape Cod Cooler’s pledge to be a good corporate neighbor, to return something to the community and thereby be embraced, and indeed consumed, by the community. As of September 1992 Buchanan and Warner were still grappling with the problem of how to lure additional investors, and once secured, how to allocate a fair interest in the corporation to these new investors. The idea of a core group of preferred stockholders and a larger group of common stock holders was then their operating model. Amended Articles of Organization were prepared in January 1992 authorizing 1000 shares of preferred stock and 5,000,000 shares of common stock. (Ex. 67.) The model was never fully implemented but the shares were issued to the college in accordance with that thought. Ericson’s failure to specify on the stock certificate whether the College’s stock was common stock or preferred stock was yet another example of his lack of proficiency as clerk of the corporation and nothing more. The college was the first, and as it turned out, the only shareholder on the second tier.
Buchanan, Warner, Ward and McGill were the core investors. In the model crafted by Buchanan and Warner the four were equal shareholders. This is borne out in documents filed in the course of Buchanan’s divorce. In July 1991, Buchanan filed a financial statement with the Probate Court admitting he owned 20% of Nantucket Natural having an “unknown” value (Ex. 16). In November of that year he filed a further financial statement admitting he owned 20% of Cape Cod Cooler’s, Inc. of “unknown” value (Ex. 18). His answers to interrogatories in the divorce action in December 1991 include the statement that “I am also one of four (4) owners of Nantucket Natural . . . the fair market value is unknown . . .” (Ex. 24.) In Buchanan’s divorce settlement agreement of January 1992 his ex-wife relinquished any interest in Cape Cod Coolers, Inc. “a Massachusetts corporation of which the Husband is approximately 20% shareholder” (Ex. 20).[5] This Court does not casually dispose of Buchanan’s admission in the divorce proceedings that he was at best a 25% owner of Cape Cod Coolers. His admission dovetails with the rest of the evidence. His chicanery in the divorce was his failure to account for Seltzer Water Trust. In contrast, he played fair with his ex-wife vis-a-vis Cape Cod Coolers, not surprisingly so inasmuch as the venture was speculative and of little immediate value.
Much was made at the trial of Buchanan’s handling of three pieces of real estate, two lots in Chatham and one lot on Nantucket. While the shuffling of these pieces of real estate between owners and mortgage holders is curious, all appear to be held for the benefit of Buchanan, and do not affect the outcome of this case, except that Buchanan’s loose dealings with the Yorick Trust need to be addressed. At one point the lot on Nantucket was held by the Yorick Trust which in turn was reported to be an asset of Cape Cod Coolers. Nonetheless, when the lot was sold in 1996 Buchanan pocketed the proceeds.[6] The lot was not purchased with Cape Cod Cooler funds. It was described as a corporate asset as a bit of hyperbole in a draft of a document to be used to lure investors to Cape Cod Coolers. While the proceeds from all three lots need not be accounted for here, the testimony as to the transactions affecting the lots did assist the Court in *703 making decisions as to the credibility of the various witnesses.

APPLICATION OF THE FACTS TO THE LAW

Warner and company have been persistent in their argument that principles of judicial estoppel require the court to hold Buchanan to the position he assumed in his divorce proceedings, i.e. that he is one of four equal shareholders in Cape Cod Coolers. Recent appellate court opinions have fleshed out the nature of this species of estoppel and have declared its application to be in the discretion of the trial judge. Aiello v Aiello, 447 Mass. 388, 399 (2006). Even if all the elements of judicial estoppel were present in this case, this jurist declines to apply the doctrine to the facts at hand. Buchanan’s admissions in the divorce pleadings serve as valuable evidence in this case but not as a ban to a full adjudication on the merits. Let us turn to the larger issues of law in this action.
A Massachusetts business corporation is governed by M.G.L.c. 156D effective July 1, 2004 and prior thereto by M.G.L.c. 156B. The operations of a particular corporation may be further restricted by the Articles of Organization and the Bylaws unique to that corporation. The Articles of Organization for Cape Cod Coolers filed July 30, 1990 are void of any restrictions on the issuance or transfer of stock beyond the cap on shares of common stock at 20,000 shares (Ex. 1). The amended articles prepared in January 1992 authorized 1000 shares of preferred stock and 5,000,000 shares of common stock with no restrictions on the issuance or transfer of shares (Ex. 67).
Cape Cod Coolers’ By-Laws contain boilerplate provisions adopted wholesale from a form book (Ex. 63). Article III, section 9 designates the clerk, in the absence of a transfer agent, as the individual responsible for keeping the records as to stock ownership. Section 1 of Article VI deals with the issuance of stock certificates. The bylaw states that “Each stockholder shall be entitled to a certificate ...” Cape Cod Coolers’ Articles of Organization and Bylaws have little impact on resolving the issues at hand.
The issuance of a stock certificate is not necessary to make a subscriber or other person a shareholder. Samia v. Central Oil Co. of Worcester, 339 Mass. 101, 110 (1959); Wood v. Roy Lapidus, Inc., 10 Mass.App.Ct. 761, 764 (1980). The directors of a corporation may authorize shares to be issued for consideration, consisting of any tangible or intangible property or benefit to the corporation, including cash, promissory notes, services performed, contracts for services to be performed or other securities of the corporation. G.L.c. 156D, §6.21(b). While the stock transfer register for Cape Cod Coolers is blank and stock certificates cannot be found for Buchanan, Warner and McGill, this court is not barred from determining the identity of the shareholders and their respective percentage of ownership. Clearly the parties to this action treated Cape Cod Coolers as a corporation both vis-a-vis the outside world and amongst themselves. Compare with Shain Investment Co., Inc. v. Cohen, 15 Mass.App.Ct. 4, 7-9 (1982) (wherein the court discusses partnerships versus joint ventures).
Buchanan argues that he is entitled to all the stock of Cape Cod Coolers by virtue of his status as the sole incorporator. Neither the law nor the facts at hand support his claim. From the outset the day-to-day operations of Cape Cod Coolers were handled by Buchanan but Buchanan and Warner functioned as a board of directors to oversee the business. They met often, governing by consent. While there are no detailed records of directors’ meetings there is a record of annual meetings at which the actions of the directors during the year were ratified (Ex. 63). Ericson’s minutes of the annual meetings consistently refer to directors and shareholders in the plural (Ex. 63). Over time they enlarged the core group of shareholders to include Ward and McGill.
The guiding precedent to the case at hand is found in Samia, 339 Mass. at 109;
This is a case where it might be appropriate to regard formal acts as done promptly which in equity ought to have been done [CITATION], and where, to do equity among the parties, undue emphasis cannot be placed upon strict compliance with corporate formalities.
In instances where the corporation is closely held, equitable principles are often applied to ensure that the shareholders are dealt with fairly. The determination that Buchanan, Warner, Ward and McGill were equal shareholders is ultimately a conclusion of fact, a conclusion left to the trier of fact on the totality of the evidence. Wilson v. Jennings, 344 Mass. 608, 614 (1962); Maurer v. E.A. Gralia Construction Co., 37 Mass.App.Ct. 403, 407 (1994).
Whether an advance of money or services to a corporation should be treated as a capital contribution or as creating a debt depends to some extent on the objective intention of the contributor and in part on whether, in the particular circumstances, equitable consideration requires treatment of the advance as a capital contribution. Yankee Microwave, Inc. v. Petricca Communications Systems, Inc., 53 Mass.App.Ct. 497, 519-20 (2002); Friedman v. Kuker, 14 Mass.App.Ct. 152, 159-60 (1982); Sher v. Malden Taxi, Inc., 4 Mass.App.Ct. 404, 409-11 (1976). The conclusion that Buchanan’s cash contributions to the venture were loans arises initially from the documents containing references to such transfers as loans. Surely the finder of fact may accept the documents at face value. Sher, 4 Mass.App.Ct. at 409. Buchanan’s objective intent as expressed in the documents matches the equities of the situation. Given that the remainder of the evidence supports the conclusion that the core shareholders each owned one quarter of the shares, Buchanan’s disproportionate cash contributions to the corporation can be best, and justly, *704 accounted for as loans to be paid back from the funds in escrow. There is no paper trail in the exhibits reflecting Warner’s intent in paying $56,000 in litigation expenses. Clearly he was not investing in a going concern or some prospective business venture, so the funds cannot be said to be capital contributions. Buchanan set the pattern for excess cash contributions as loans. Warner’s $56,000 follows suit.
Both the amended complaint and the amended counterclaim seek declaratory relief. The plaintiff has expressly requested that the court apportion the funds now in escrow. While the amended complaint and amended counterclaim do not contain counts expressly seeking the return of funds loaned to Cape Cod Coolers, justice cannot be done in this matter without making a provision for repayment of loans. Such is required under broad equity powers consistent with the nature of this action for declaratory judgment.
Accepting Buchanan’s $300,000 and Warner’s $56,000 as loans to the corporation leaves two questions. First, what amount of interest, if any, is due? Second, if interest is due, when does it start to run? The first question is answered by G.L.c. 107, §3, interest not otherwise specified is at 6% per year. The 6% figure fits well with the cost of money during the almost two decades since Buchanan set forth on his quest. Buchanan’s $300,000 was spent over a six-year period from 1989 through August 1994, but not at a consistent pace. The greater part of his funds were spent during the first three years of the project. Absent an accurate accounting, justice can best be done by determining that Buchanan is due interest on $300,000 at 6% per year starting November 1, 1991. Assuming the date of judgment is November 1, 2006, the gentleman is due $570,000 on his loans (($300,000 x .06 x 15) + 300,000). Warner’s $56,000 was spent between August 1994 and November 1998. Fairness dictates that Warner is due interest on his money from November 1, 1996. In total, Warner is due $89,000 on his loans (($56,000 x .06 x 10) + 56,000) as of November 1, 2006.
What remains is to allocate the proceeds awarded in the Coca Cola suit. Some $3,700,000 is held in escrow pending final judgment of the present action. The first distributions from the escrow funds will be to Buchanan and Warner for $300,000 and $56,000 respectively, plus prejudgment interest at 6% as set forth above. Postjudgment interest shall accrue at the rate of 12% until the date of distribution. The remaining funds are to be distributed as follows:
1% to Cape Cod Community College
24.75% to William R. Buchanan
24.75% to John D. Warner
24.75% to James F. Ward
24.75% to Trevor McGill or the CHMC Pension Plan.

ORDER

For the above reasons, judgment shall enter DECLARING that:
a) Cape Cod Community College owns 1% of the equity of Cape Cod Coolers, Inc.; William R. Buchanan, John D. Warner, James F. Ward and Trevor McGill (or his designee the CHMC Pension Plan) each own 24.75% of the equity of Cape Cod Coolers, Inc.
b) Cape Cod Coolers, Inc. is indebted to William R. Buchanan in the sum of $300,000 and to John D. Warner in the sum of $56,000, together with interest as provided in this decision;
c) the assets of Cape Cod Coolers, Inc. shall be DISTRIBUTED in accordance with this decision;
d) after distribution of all assets, Cape Cod Coolers, Inc. shall be deemed to be DISSOLVED; and
e) none of the parties are to recover their costs of action.

There was testimony as well that not all the Hinds in Seltzer Water Trust were Buchanan’s. Some money in the Tmst may have originated with the plaintiffs father.

The $300,000 figure is determined from assets available in Seltzer Water Tmst, known transfers from the Tmst to Cape Cod Coolers, and a reconstruction of Cape Cod Coolers’ cash flow presented at the 1998 trial against Coca Cola (Ex. 91).

Ericson wore three hats as corporate counsel, clerk of the corporation, and counsel to Buchanan, but his loyalty was to Buchanan in 1996. His 1996 statement is accepted by this jurist as an admission, by Buchanan’s agent, against Buchanan’s interests. His subsequent recantation, in a letter (Ex. 65) and on the stand in the present case is not credible. Ericson’s demeanor at trial and his convenient lack of memory did nothing to enhance his credibility.

The others were not listed on the form but the vast bulk of the evidence precludes one from arguing that this form 2553 should be taken as evidence that the others were not shareholders. Oddly enough, from 1991 through 1994 Ericson prepared, signed and filed the annual corporate reports with the Massachusetts secretary of State’s office wherein, for each year, he swore that zero shares of stock were “issued and outstanding.”

The court assumed that the variation between the documents as to a 20% interest, four shareholders and an approximately 20% interest reflects the uncertainty that then existed as to who would be the core investors. Clearly Warner was on board throughout this period. Ward was in the works during 1991 and ponyed up his $50,000 in January 1992. McGill had yet to appear. Others, including Osganian and Ericson, were also under consideration or hoped for. When Kayajan appeared on the scene in 1992 there was some discussion as to whether he would be brought into the inner circle.

The Court rejects as preposterous Buchanan’s testimony that the proceeds after the sale of the Nantucket lot were distributed perTappan’s orders. Ericson conveniently had no records for the distribution despite his acting as closing counsel.